**ZIPPO MANUFACTURING COMPANY,**
Plaintiff,

v.

**ROGERS IMPORTS, INC., Defendant.**

United States District Court
S. D. New York.
April 22, 1963.

Burgess, Ryan & Hicks, New York City, Brown, Critchlow, Flick & Peckham, Pittsburgh, Pa., for plaintiff; John F. Ryan, New York City, William B. Ryan, New York City, Karl B. Lutz, Pittsburgh, Pa., of counsel.

Willkie, Farr, Gallagher, Walton & FitzGibbon, New York City, Karl W. Flocks, Washington, D. C., for defendant; William Sullivan, New York City, of counsel.

FEINBERG, District Judge.

This case involves the attempt of a manufacturer of a popular cigarette lighter to keep others from imitating the lighter's shape and appearance. Plaintiff Zippo Manufacturing Company ("Zippo"), a Pennsylvania corporation, alleges both trademark infringement and unfair competition on the part of defendant Rogers, Inc.[1] ("Rogers"), a New York corporation, by reason of Rogers' sale of pocket lighters closely resembling Zippo's. Plaintiff seeks injunctive relief, an accounting, and damages. Rogers counterclaims for a judgment declaring that plaintiff is unfairly competing with it and also seeks injunctive relief. Jurisdiction of the main action is based both on diversity of citizenship and a claim under the trademark laws joined with a related claim of unfair competition.[2] Defendant also relies for

1. Defendant was formerly known as Rogers Imports, Inc.

2. Plaintiff's complaint and Pre-trial Memorandum cite 28 U.S.C. §§ 1332, 1338(b), and 15 U.S.C. § 1114(1) as jurisdiction-al bases for the action. The original complaint, filed March 25, 1959, alleged "trademark use" of the name "Slimlighter." Paragraph 10. One month later, the complaint was amended to in-

jurisdiction on the Declaratory Judgments Act, 28 U.S.C. §§ 2201–2202 (1952), as amended, 28 U.S.C. § 2201 (Supp. IV, 1957).

## I

Plaintiff Zippo has been primarily engaged in the manufacture of pocket lighters since 1932,[3] and it has grown spectacularly over the years. Its annual national sales of these lighters grew from about 27,000 units in 1934 to over 3,180,000 in 1958, the year just prior to suit, and well over 4,000,000 in 1961. Today, Zippo produces more units than any other domestic lighter manufacturer. Its pocket lighters are made in two models, the "standard" and the "slim-lighter." The latter accounts for slightly less than twenty-five per cent of the number of pocket lighters sold by Zippo.

Prior to World War II, Zippo sold only a standard model, the forerunner of its present standard lighter. This pre-war lighter was covered in part by a patent.[4] This model had a two-member outside case with a snugly fitting insert containing the mechanical features of the lighter. The bottom member of the outside case had a matching flip-top member hinged to it; both were rectangular with square corners and straight lines. The user opened the top to activate the lighter by striking the flint wheel, and closed the top to snuff out the flame produced in the lighter's "chimney." To hold the flip-top in a fully opened or closed position, the lighter incorporated a spring and cam arrangement which enabled the user to operate the top with one hand. A most important feature of the lighter was an elliptical chimney or windscreen enclosing the wick, with round air holes punched into its sides in horizontal rows in a three-two-three formation. Attached to one side of the chimney were two square "ears" or lugs, which held the cam in position above a vertical coil spring located underneath the cam in a tube inside the lighter case. The flint wheel was pivotally mounted upon another set of lugs projecting from the other side of the chimney.

Until 1938, the appearance of the lighter was that shown in the illustrations of the Gimera patent. In that year, Zippo slightly altered the internal mechanical operation of its lighter and, for reasons of economy and efficiency, also changed the shape of its lighter in some respects.[5] No change was made in this standard model until 1942, when Zippo began to devote its entire output of lighters to the production of its "war" model.[6] This lighter, embodying the same mechanical features of the immediately pre-war standard model, was finished in a crackle paint. In June 1946, Zippo again returned to the production of its peacetime standard model and has continued to manufacture it without major change to the present time.[7]

A comparison of the present standard with the early Zippo standard model (1934–1938) indicates the following principal changes: the former model had severely square edges and corners and straight lines while the present lighter features slightly rounded edges and corners, a curvature in the shape of a slight arc in the top of the lighter,

clude an allegation of registration of that name on the Supplemental Register of the United States Patent Office on April 7, 1959.

3. Transcript, pp. 63–64. [Transcript hereinafter referred to as "Tr."]

4. U.S. Patent No. 2,032,695 ("the Gimera patent"), issued on March 3, 1936, to George Gimera and George G. Blaisdell, assignors to Zippo. Plaintiff's Exhibit 3. [Plaintiff's Exhibit hereinafter referred to as "Pl.Ex."] An example of this pre-war model was introduced at the trial. Pl.Ex. 6.

5. Tr. pp. 94, 315–17; Plaintiff's Main Brief, p. 20.

6. Tr. pp. 94–95.

7. Tr. p. 97. Zippo has added a hardened steel collar to the top of the brass flint tube. This feature does not affect the outward appearance of the lighter. It is covered by U.S. Patent No. 2,517,911, issued in 1950, currently marked on the bottom of recent Zippo standards. Tr. pp. 97–98.

and a recess in the bottom of the case; in the early model, the leaves of the hinge attaching the top and bottom members of the lighter case were on the outside of the case, but they are now located inside the case; the ears or lugs holding the cam were previously square in shape, but now they are rounded; and while the cam and spring arrangement embodied a vertical coil spring in the old model, a horizontal flat "leaf" spring is now used.[8]

In June 1956, Zippo introduced its slim-lighter, a new model designed to appeal to women.[9] This model included the same mechanical features as the standard, but it was noticeably narrower and, therefore, less square and more rectangular in shape. Its dimensions were approximately $2\frac{1}{8}'' \times 1\frac{1}{8}'' \times \frac{3}{8}''$, compared to $2\frac{1}{8}'' \times 1\frac{1}{2}'' \times \frac{1}{2}''$ for the standard.[10]

Over the years, Zippo's sales techniques have included extensive advertising, unconditional guarantees, and free repair service. Since 1949, the company has spent at least $500,000 each year in advertising its products. In 1958, it spent over $700,000, and in two of the next three years, over $1,000,000 per year.[11] Its advertising has appeared in magazines and periodicals of both national and specialized appeal.[12] Zippo's advertisements of the standard model have featured, among other things, the word "windproof";[13] the mark "Slim-lighter" has been emphasized in advertising its slim-lighter.[14] Zippo's unconditional guarantee and free repair service have also been highlighted.[15] Throughout its history, Zippo has consistently promised to repair any Zippo lighter free of charge, regardless of its age or condition,[16] and many purchasers have availed themselves of this service. For example, in 1961, almost 460,000 lighters were sent to the company for free repairs.[17]

Zippo markets eighty to ninety per cent of its standard and slim-lighters in individual cardboard boxes.[18] These boxes are distinctively designed, and feature the name "Zippo."[19] Its lighters are primarily sold to the individual consumer in retail marketing channels, although approximately thirty-eight per cent of Zippo lighters are sold to commercial organizations which use the lighters for advertising or public relations purposes.[20] Zippo also markets a very small percentage of its lighters through the use of display cards, which are changed to some extent each year.[21] Two of plaintiff's display cards introduced in evidence featured the name

---

8. Tr. pp. 91–93. Although the new spring arrangement was not covered by the Gimera patent, Zippo's lighters continued to carry the number of that patent until it expired in 1953. Tr. pp. 98, 187–91; Plaintiff's Main Brief, p. 63.

9. Tr. pp. 102–03.

10. All Zippo standard models are now marked with "Zippo" and "Bradford, Pa." on the bottom of the outside case. Pl.Ex. 8; see Tr. p. 85. The slim-lighter is merely marked "Zippo," because of space limitation. Pl.Ex. 14; Tr. p. 105. On both models, the inside case, which can be pulled out for fueling purposes, is marked with Zippo's name and address.

11. Pl.Ex. 1.

12. Pl.Ex. 2.

13. Pl.Exs. 4, 5; Tr. p. 77. However, some recent advertisements of the standard do not contain the word "windproof." See Pl.Ex. 9.

14. Pl.Ex. 12.

15. Pl.Ex. 13; Tr. p. 77.

16. Zippo does not guarantee the lighter's finish.

17. Tr. p. 91. To facilitate the repair process, Zippo today supplies small, self-addressed bags to dealers in which the lighters can be returned to the company. Tr. p. 89.

18. Tr. pp. 169–70.

19. Defendant's Exhibits 1B, 1C. [Defendant's Exhibit hereinafter referred to as "Def.Ex."] The individual box used until about six months ago, Def.Ex. 40, also featured the word "windproof," but the most recent boxes do not.

20. Tr. pp. 160–62.

21. Tr. pp. 146, 157–59. Zippo also markets lighters for sale to the Armed Services in smaller folding boxes. Tr. p. 168.

"Zippo" imposed in red letters upon a blue background.[22] On one, the word "Windproof" appears in white letters; on the other, the words "Slim Lighter" appear in white lettering.

Defendant Rogers or its predecessor has been in business since the first decade of this century. It offers nationally to the public a full line of smoking accessories, including pipes, tobacco pouches, and lighters. Rogers does not manufacture its lighters or pipes, but does produce its own tobacco pouches, which, according to the company's president, account for seventy per cent of sales of pouches in the United States.[23] The company has grown consistently over the years. In 1932, its gross sales approximated $13,000; in 1958, $1,570,000; and since then, according to its president, gross sales have been in the area of $2,000,000 yearly.[24]

Rogers, on a much more limited basis than Zippo, has advertised its products nationally in a variety of publications.[25] From 1932 to 1958, Rogers spent over $1,335,000 on advertising on a gross sales figure of approximately $18,160,000; in 1958, it spent about $72,000 for advertising on sales of approximately $1,570,-000.[26]

In the fall of 1957, Rogers began to sell imported Japanese lighters[27] with full knowledge that they closely resembled the Zippo lighters.[28] Rogers has marketed these lighters with apparent success. In 1958, it sold between 240,000 and 360,000 lighters of this type; in 1959,

approximately 720,000; in 1960, approximately 500,000; in 1961, approximately 380,000; and in 1962, approximately 360,000.[29] Dollar volume from sales of these lighters accounted for about fifteen to eighteen per cent of Rogers' total gross sales in 1959; in 1962, it accounted for about seven per cent of gross sales.[30]

A comparison of these imported "720" lighters[31] with the Zippo models reveals a striking similarity in shape and appearance. Thus, referring to Zippo and Rogers standard models,[32] the dimensions, the configuration, and the finish of the outside case of the lighters are almost the same; the windscreens, even with respect to the three-two-three arrangement of the airholes, are almost identical; the shape of the ears supporting the cam and flint wheel and the shape of the cam itself are the same; and the manner in which the lighters open and close is the same. In short, the Rogers standard is a Chinese copy of the Zippo, except for the inscriptions on the bottom of the lighters' outside cases. Comparison of the Zippo and Rogers slim-lighters[33] compels the same conclusion.

Rogers markets these lighters exclusively by the use of display cards which carry the Rogers name.[34] For example, on a 1958 display card,[35] exhibiting the Rogers' lighter resembling Zippo's slim-lighter, the name "Rogers" appears in the upper left hand corner in large black logotype on a circular yellow background about 2¾ inches in diameter. The word "Slim" appears at the top of the card

22. Pl.Exs. 10, 11. The word "Zippo," printed diagonally in capital letters, was registered as trademark No. 317,219 in the United States Patent Office on September 18, 1934. Def.Ex. 10. Plaintiff makes no claim of infringement of this mark.

23. Tr. p. 912.

24. Def.Ex. 7; Tr. pp. 943–44

25. Def.Ex. 6.

26. Def.Ex. 7.

27. Tr. p. 932. Rogers had apparently been importing a different Japanese lighter earlier that year, Tr. p. 947, and prior to 1957, an English pipe lighter, Tr. p. 911.

28. Tr. pp. 947–48.

29. Tr. pp. 942–43.

30. Tr. p. 946.

31. Rogers refers to these as its "720 Windproof" models. Tr. pp. 912, 919. Rogers sold another model with an enamel finish similar in shape to Zippo's slim-lighter. This was known as its "Lady Rogers" lighter, and it is no longer sold by Rogers. Tr. p. 922.

32. Pl.Exs. 8 and 17, respectively.

33. Pl.Ex. 14 and Def.Ex. 1E, respectively.

34. Tr. pp. 921–22.

35. Pl.Ex. 16.

in tall black letters, and underneath, the word "Lighters." A picture of a "thin" man dressed in evening wear appears on the right hand side of the display card extending from the top to the bottom of the card. In the lower right hand corner, the words "Made in Japan" are printed in very small black letters; similarly, in the lower left hand corner, the name "Rogers Imports, Inc." appears; and printed directly above and across the entire bottom of the card are the words "Windproof—Unconditionally Guaranteed." The display card is approximately fifteen inches high and ten inches wide.[36] In similar display cards used in 1960, the word "Slim" was eliminated.[37] Defendant has offered to print on its display cards this legend: "This is not a Zippo; this is a Rogers lighter."[38]

The imported lighters in question were marked prominently with the name "Rogers" and the word "windproof" on the bottom of the lighter's outside case.[39] Commencing in late 1959 or early 1960, the marking on the bottom of the outside case was changed to read:

"Rogers, Inc.
New York, N. Y.
Made in Japan"[40]

After Rogers commenced marketing its allegedly offending lighters in 1957, Zippo began receiving Rogers lighters from consumers who wished to have them repaired through Zippo's free repair policy. At the time of trial, a total of 191 Rogers lighters had been received by Zippo in this manner.[41] Zippo's policy was to return the lighter to the person from whom it was received, together with a form letter stating that the lighter was not a Zippo product, and, therefore, the company would not repair it.[42] Zippo then sent questionnaires to a substantial majority of those persons who had sent Rogers lighters to it. Seventy-five of such questionnaires were introduced into evidence at the trial.[43] The questionnaires were designed to find out in each case why the lighter was returned to Zippo even though it clearly bore the Rogers name.[44]

Zippo contends that the Rogers "720" lighters are inferior to those it manufactures. To buttress this contention, reports of tests conducted by Zippo on Rogers "720" lighters were introduced at the trial.[45] On all the evidence, it appears that the Zippo lighters are superior to Rogers lighters, both as to material and workmanship. This is reflected in the retail price differential between the lighters. The retail price for the Rogers "720" model is $1.00;[46] the retail price for the standard Zippo in recent years has been $3.50 and up, and

36. Of the other Rogers display cards in evidence, one was the same size, Def. Ex. 48A, two were slightly smaller, Def.Exs. 48B, 48C, and another was appreciably larger. Def.Ex. 48D.

37. Def.Ex. 48A; Tr. pp. 917–18. In late 1959, Rogers also discontinued selling one of the "720" models which utilized a ribbon-stripe design similar to that used by Zippo on one of its slim-lighter models. Tr. p. 921.

38. Tr. p. 924.

39. Pl.Ex. 17. The word "Japan" was also inscribed in minute letters.

40. Tr. pp. 918–21.

41. Tr. pp. 119, 131–32, 691, 702. Other instances of these returns were covered by stipulation. See Pl.Exs. 39–42. Zippo has also received Ronson lighters for repairs, but these were "relatively few" compared to the Rogers lighters. Tr. p. 264.

42. Tr. p. 119.

43. Pl.Exs. 23–25, 37, 38. The parties have stipulated that if consumers who answered the questionnaires were called to testify, they would give the same answers that they actually gave in completing the question forms. The number of questionnaires sent by Zippo was also substantially covered by various stipulations. See, e. g., Pl.Ex. 39.

44. See, e. g., Pl.Exs. 23–25.

45. Pl.Exs. 28, 31; Tr. pp. 277–303.

46. Tr. pp. 917–18, 922. The discontinued "Lady Rogers" lighter sold for $1.50. See note 31 supra.

for the Zippo slim-lighter $4.75 and up, depending on the model.[47]

Plaintiff introduced into evidence lighters manufactured by other companies [48] to show that a lighter with the same windproof characteristics as a Zippo could be made without exactly simulating the Zippo appearance, e. g., the "Windlite," manufactured by Ronson Metal Art Works, Inc.[49] This lighter differs from the Zippo in shape, as well as ornamentation, and has thin vertical slits rather than round holes in its windscreen.[50] Defendant introduced windproof lighters made by other manufacturers [51] simulating the appearance of the Zippo, e. g., the "Storm King," [52] manufactured by Park-Sherman Co. Although Zippo has not sought injunctive relief against this company,[53] it has taken steps in the past to stop the importation of Japanese lighters imitating the shape and appearance of Zippo models. Thus, Zippo has filed complaints with various agencies in this country and in Japan,[54] and it has sent letters to ten different domestic concerns complaining about the importation problem and asking that it be terminated.[55] Zippo has also brought other suits in federal courts seeking injunctive relief.[56]

## II

Plaintiff's unfair competition action will be considered first, since, as indicated below, its claim of trademark infringement does not require extended comment. There does not appear to be any conflict between the parties as to the source of the applicable law. Determination of that question, if necessary, would be difficult, since plausible arguments have been advanced to show that state law alone or federal law alone, or some amalgam of both, is the proper source of doctrine.[57] In this case, however, the parties have relied on both New York and federal cases,[58] and do not argue that looking to one source rather than the other would bring about a significant difference in the content of the applicable law. Plaintiff asserts that its case rests, *inter alia*, upon the establishment of secondary meaning for the shape and appearance of its lighter.[59] While there may be New York cases supporting the view that secondary meaning is not a prerequisite to establishing unfair competition in some situations,[60] on the facts of this case, they would not seem applicable. Therefore, it is not necessary to pursue the matter further. Rather than, in Judge Medina's words, "unnecessarily rushing in where angels fear to tread" [61] to determine this complex question of the source of the applicable law, it will be assumed that "the indeterminate federal law" applies, with particular reference

47. Pl.Ex. 13.

48. Pl.Exs. 19–21.

49. Pl.Ex. 21.

50. Pl.Ex. 21; see Tr. pp. 117–18.

51. Def.Exs. 41, 42, 46, 1–I; Tr. p. 907.

52. Def.Ex. 1–I; Tr. p. 907.

53. Tr. pp. 250–51, 272–73.

54. Tr. pp. 140–41.

55. Tr. p. 141.

56. In two of these suits, the defendant in each agreed to cease selling the offending lighters. Tr. pp. 141–42. In another suit, Zippo Mfg. Co. v. Manners Jewelers, Inc., 180 F.Supp. 845 (E.D. La.1960), a preliminary injunction was denied.

57. See Hygienic Specialties Co. v. H. G. Salzman, Inc., 302 F.2d 614, 619 n. 9 (2 Cir. 1962); Maternally Yours, Inc. v. Your Maternity Shop, Inc., 234 F.2d 538, 540 n. 1 (2 Cir. 1956); Continental Cas. Co. v. Beardsley, 151 F.Supp. 28, 42–43 (S.D.N.Y.1957), modified, 253 F.2d 702 (2 Cir.), cert. denied, 358 U.S. 816, 79 S.Ct. 25, 3 L.Ed.2d 58 (1958).

58. Tr. pp. 35, 38. The briefs cite both federal and New York cases.

59. Plaintiff's Main Brief, p. 6.

60. See authorities collected in Flexitized, Inc. v. National Flexitized Corp., 214 F. Supp. 664 (S.D.N.Y.1963). The opinion points out, however, that "where the design of the product itself is the identifying mark," unique considerations may apply. Id. at 675.

61. See American Safety Table Co. v. Schreiber, 269 F.2d 255, 271 (2 Cir.), cert. denied, 361 U.S. 915, 80 S.Ct. 259, 4 L.Ed.2d 185 (1959), modified, 287 F. 2d 417 (2 Cir. 1961).

to expressions of that law in decisions of the Court of Appeals for this Circuit.[62]

What, then, is the content of the law? Plaintiff has quoted copiously [63] from the Restatement of Torts, which states:

"§ 741. Elements of Unprivileged Imitation.

"One who markets goods, the physical appearance of which is a copy or imitation of·the physical appearance of the goods of which another is the initial distributor, markets them with an unprivileged imitation,·under the rules stated in § 711 [general rule of liability], if his goods are of the same class as those of the other and are sold in a market in which the other's interest is protected, and

"*     *     *     *     *     *

"(b) the copied or imitated feature has acquired generally in the market a special significance identifying the other's goods, and

"(i) the copy or imitation is likely to cause prospective purchasers to regard his goods as those of the other, and

"(ii) the copied or imitated feature is non-functional, or, if it is functional, he does not take reasonable steps to inform prospective purchasers that the goods which he markets are not those of the other."

This is the view adopted in many cases in this Circuit. A classic statement appears in Crescent Tool Co. v. Kilborn &

Bishop Co., 247 F. 299, at p. 300 (2 Cir. 1917), where Judge Learned Hand said:

"The cases of so-called 'nonfunctional' unfair competition, starting with the 'coffee mill case,' Enterprise Mfg. Co. v. Landers, Frary & Clark, 131 Fed. 240, 65 C.C.A. 587, are only instances of the doctrine of 'secondary' meaning. All of them presuppose that the appearance of the article, like its descriptive title in true cases of 'secondary' meaning, has become associated in the public mind with the first comer as manufacturer or source, and, if a second comer imitates the article exactly, that the public will believe his goods have come from the first, and will buy, in part, at least, because of that deception. Therefore it is apparent that it is an absolute condition to any relief whatever that the plaintiff in such cases show that the appearance of his wares has in fact come to mean that some particular person—the plaintiff may not be individually known—makes them, and that the public cares who does make them, and not merely for their appearance and structure. It will not be enough only to show how pleasing they are, because all the features of beauty or utility which commend them to the public are by hypothesis already in the public domain. The defendant has as much right to copy the 'nonfunctional' features of the article as any others, so long as they have not become asso-

---

62. See Supreme Wine Co. v. American Distilling Co., 310 F.2d 888, 889 n. 2 (2 Cir. 1962); Safeway Stores, Inc. v. Safeway Properties, Inc., 307 F.2d 495, 497 n. 1 (2 Cir. 1962); Blisscraft of Hollywood v. United Plastics Co., 294 F.2d 694, 697 (2 Cir. 1961). It will be further assumed that in applying "the indeterminate federal law," the Court can look both to New York and federal cases. See Maternally Yours, Inc. v. Your Maternity Shop, Inc., 234 F.2d 538, 545 (2 Cir. 1956), where Judge Clark, in his concurring opinion, stated:

"[T]he issue is really whether we shall apply our regurgitation of the state redistillation of federal precedents or go more directly and realistically to the sources themselves. Actually, *   *   * we have never found any difference in ultimate result, and so quite often lump federal and New York law together, *   *   * or—even more conveniently—eschew all reference to the matter."

63. Plaintiff's Pre-trial Memorandum, p. 6, incorporated by reference in Plaintiff's Trial Brief, p. 1.

ciated with the plaintiff as manufacturer or source. The critical question of fact at the outset always is whether the public is moved in any degree to buy the article because of its source and what are the features by which it distinguishes that source. Unless the plaintiff can answer this question he can take no step forward; no degree of imitation of details is actionable in its absence."

In that case, the lower court had granted a preliminary injunction enjoining defendant from manufacturing and selling an adjustable wrench similar in shape and appearance to plaintiff's. The Court of Appeals for this Circuit reversed on the ground that plaintiff had not proved that when defendant began to make its wrenches, "the general appearance of the plaintiff's wrench had come to indicate to the public any one maker as its source, or that the wrench had been sold in any part because of its source, as distinct from its utility or neat appearance." [64]

More recently, the Court of Appeals has expressed similar views. In American-Marietta Co. v. Krigsman, 275 F.2d 287, at p. 289 (2 Cir. 1960), the Court, again through Judge Hand, said:

"The whole basis of the law of 'unfair competition' in this aspect is that no one shall sell his goods in such a way as to make it appear that they come from some other source. The simplest form of this is to use the name or trademark of another, but the law goes further than that. If the goods have certain features that have no significance as to the provenance of the goods, yet have come to have a 'secondary meaning' which may mislead buyers into supposing that they come from a source on which the buyers rely, those fea-

tures may not be copied. That is the doctrine of 'non-functional' copying, and is limited to those features of the original goods that are not in any way essential to their use. If in addition to being 'non-functional' these features have indeed come to signify origin in the minds of buyers, a second comer in the field will be forbidden to incorporate those features into the design of his own wares; the chance that this will deflect buyers who would otherwise buy of the putative other source cancels the second comer's privilege of reproducing the original, which he has in common with the public at large."

In that case, the Court affirmed the denial of a preliminary injunction against the sale and manufacture of a sponge mop, on the ground that plaintiff had not shown that the copied features of the mop were the reason for alleged confusion of origin among purchasers.

In Hygienic Specialties Co. v. H. G. Salzman, Inc., 302 F.2d 614 (2 Cir. 1962), the Court of Appeals again similarly stated the applicable law of unfair competition. In that case, the District Court, 189 F.Supp. 790, had granted an injunction on the theory, *inter alia,* that defendants had engaged in unfair competition by selling a soap dish similar in appearance to plaintiff's soap dish. The Court of Appeals reversed, stating through Judge Kaufman, (302 F.2d at pp. 619–620):

" * * * [T]he courts have repeatedly held that the copying of an unpatented design does not in itself constitute unfair competition. Algren Watch Findings Co., Inc. v. Kalinsky, 197 F.2d 69, 70 (2nd Cir. 1952); General Time Instruments Corp. v. U. S. Time Corp., supra [2 Cir.], 165 F.2d [853] at p. 854.

64. 247 F. at 300–01. For the view that Crescent Tool, in requiring secondary meaning, was contrary to other early decisions in the Second Circuit requiring only likelihood of deceiving purchasers, see Smith, Kline & French Labs. v. Wald-

man, 69 F.Supp. 646 (E.D.Pa.1946); 3 Callman, Unfair Competition and Trade Marks, 1259–60 (2d ed. 1950). But see Pollack, Unfair Trading By Product Simulation: Rule or Rankle?, 23 Ohio St. L.J. 74, 86 (1962).

"On ·the other hand, competition must be 'fair' both to the consumer, and so far as possible, to the trade. Consumer protection has been limited (in this context) to the prevention of confusion, i. e., the customer should not be misled into purchasing an article from one producer in the belief that it was made by someone else or emanates from some other (but unidentified) source. Norwich Pharmacal Co. v. Sterling Drug, Inc., supra, [2 Cir.] 271 F.2d [569] at p. 571. In order to recover on this theory, the plaintiff must show that a 'special significance attaches in the public mind to the nonfunctional attributes of its wares'; or, in other words, that they have a 'secondary meaning.' Ibid.; American-Marietta Co. v. Krigsman, 275 F.2d 287, 289 (2nd Cir. 1960). To establish such secondary meaning in this case Hygienic must prove that (1) the soap dish design is a mark of distinction identifying its source, and, also that (2) purchasers are moved to buy the soap dish because of its source. Blisscraft of Hollywood v. United Plastics Co., 294 F.2d 697; Lucien Lelong, Inc. v. Lander Co., Inc., 164 F.2d 395, 397 (2nd Cir. 1947). This it has not done. * * * Hygienic has not shown that a single consumer bought one of these soap dishes *because* of its source. On the contrary, we agree entirely with the trial judge that 'it is unlikely' that a buyer would 'give any thought at all to the identity ,of the producer. Manifestly, a purchaser of this simple and inexpensive household item * * * relies not on the reputation of the producer, but upon the apparent quality and eye appeal of the product itself.' 189 F.Supp. 794. And as Judge Learned Hand stated almost a half a century ago, "it is an absolute condition· to any relief whatever' on this theory 'that the public cares who does make them, and not merely for their appearance

and structure.' Crescent Tool Co. v. Kilborn & Bishop Co., 247 F. 299, 300 (C.C.A.2, 1917) ; Chas. D. Briddell, Inc. v. Alglobe Trading Corp., supra, 2 Cir., 194 F.2d 416."

■ Therefore, plaintiff can obtain relief only if it meets its burden of proving that:

(1) Defendant's lighter copies plaintiff's lighter;

(2) A copied feature has acquired a special significance in the market identifying plaintiff as the source of the lighter, and that purchasers are moved in any degree to buy the lighter because of its source ("secondary meaning") ;

(3) Such copied feature in defendant's lighter is likely to cause prospective purchasers to regard the lighter as coming from plaintiff;

(4) Such copied feature is nonfunctional. It should be noted, however, that even if the copied feature is functional, plaintiff may still be entitled to relief if defendant has not taken reasonable steps to set its lighter apart from plaintiff's in the public mind. Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73 (1938) ; Vaughan Novelty Mfg. Co. v. G. G. Greene Mfg. Corp., 202 F.2d 172 (3 Cir.), cert. denied, 346 U.S. 820, 74 S.Ct. 34, 98 L.Ed. 346 (1953). In the Kellogg case, after reaching a conclusion that plaintiff could not prevent defendant from making its product (shredded wheat biscuit) in the same pillow shape used by plaintiff, the Supreme Court pointed out (305 U.S. at p. 120, 59 S.Ct. at p. 114) that "[f]airness requires that [defendant's manufacture of the biscuit] be done in a manner which reasonably distinguishes its product from that of plaintiff." See Shredded Wheat Co. v. Humphrey Cornell Co., 250 F. 960 (2 Cir. 1918) ; cf. Modern Aids, Inc. v. R. H. Macy & Co., 264 F.2d 93 (2 Cir. 1959).

■ The above analysis of the law of unfair competition is not meant to be exhaustive. Courts have also granted relief in unfair competition cases on the theory that other factors besides sec-

ondary meaning are controlling, such as deceptive marketing practices, American Safety Table Co. v. Schreiber, supra note 61; intention to palm off goods as the product of another, Upjohn Co. v. Schwartz, 246 F.2d 254 (2 Cir. 1957); or "violation of plaintiff's property rights," International News Service v. Associated Press, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918).[65] However, it is not necessary to consider the rationale of these and similar cases [66] because these factors are not involved here. Rogers is an established company attempting to develop its own name and reputation, and is not attempting to trade on the name of its competitor. Plaintiff has argued that Rogers has copied a number of features of plaintiff's method of doing business.[67] However, the conduct complained of seems unobjectionable (e. g., offering a guarantee), unimportant,[68] or legally defensible.[69] Viewing defendant's conduct as a whole, I find that it has not been guilty of intentionally deceptive marketing practices or any attempt to palm off its lighter as one manufactured by Zippo.[70] On the other hand, it has clearly attempted to obtain the commercial benefit of marketing a lighter of a certain shape and appearance popularized by Zippo. Whether Zippo can prevent it from doing so is the question to be decided under the law set forth above.

Defendant argues, *inter alia,* that plaintiff must, in any event, prove actual deception or a clearly calculated plan to deceive in order to obtain relief.[72] This appears to be an inaccurate statement of the law and an inversion of the cases cited above at p. 680. Those cases support the proposition that intention to deceive or actual deception might *alone* justify relief even if secondary meaning were not present. They represent, if anything, a relaxation of the requirements for a plaintiff in an unfair competition action, and do not purport to require proof of a plan by defendant to deceive in every case. Defendant also claims that plaintiff has not proved secondary meaning or confusion of source and that the imitated features are, in any event, functional. These and other contentions of defendant will be referred to below.

### III

Plaintiff has relied heavily on a consumer study [73] to prove the elements of its case. This study was prepared and conducted by the sampling and market research firm of W. R. Simmons & Associates Research, Inc. Mr. Simmons, the head of this firm, and Donald F. Bowdren, the project supervisor, appeared as witnesses; both are qualified experts in the field of consumer surveys.[74] Mr. Bowdren testified that the purpose of the study was to determine whether the physical attributes of the Zippo standard and slim-lighters serve as indicators of the source of the lighters to potential cus-

65. See Norwich Pharmacal Co. v. Sterling Drug, Inc., 271 F.2d 569, 571 (2 Cir. 1959), cert. denied, 362 U.S. 919, 80 S.Ct. 671, 4 L.Ed.2d 739 (1960). See also Flexitized, Inc. v. National Flexitized Corp., 214 F.Supp. 664 (S.D.N.Y.1963), where relief would clearly be justified on this basis.

66. See Note, 70 Yale L.J. 406, 412–30 (1961), and authorities cited therein. Moreover, some courts have appeared to require no more than the likelihood of confusion as to the source of products in order to make out a case of unfair competition. E.g., Stiffel Co. v. Sears, Roebuck & Co., 313 F.2d 115 (7 Cir. 1963); cf. note 60 supra. Plaintiff does not contend that this is the applicable law here.

67. Plaintiff's Main Brief, p. 76, pointing, *inter alia,* to Rogers' use of the words "slim-lighter" and "windproof," and its featuring of a guarantee in advertisements.

68. See notes 13, 19, and 37 supra and accompanying text.

69. See p. 699 infra, regarding plaintiff's failure to prove a valid trademark in "Slim-lighter."

70. Cf. Tr. p. 719.

71. Tr. pp. 947–48.

72. Defendant's Brief After Trial, p. 51.

73. Pl.Ex. 26.

74. Tr. pp. 338–40, 454–55.

tomers and whether the similar physical attributes of the Rogers lighters cause public confusion.[75] The study or project consisted of three separate surveys. In Survey A, the respondents, or interviewees, were shown a Zippo standard lighter which had all the Zippo identification markings removed and were asked, among other things, what brand of lighter they thought it was and why. In Survey B, the same procedure was followed for the Zippo slim-lighter. In Survey C, respondents were shown a Rogers standard lighter that was being sold at the time of the survey,[76] with all of its identifying markings, and they were asked, among other things, what brand of lighter they thought it was and why.

■ Mr. Simmons' testimony and the project report made clear the principles and procedures by which the surveys were conceived and conducted.[77] Testimony to this effect is important, because it is well settled that the weight to be given a survey, assuming it is admissible, depends on the procedures by which the survey was created and conducted. Rhodes Pharmacal Co. v. Federal Trade Comm., 208 F.2d 382, 387 (7 Cir. 1953), rev'd in part on other grounds, 348 U.S. 940, 75 S.Ct. 361, 99 L.Ed. 736 (1955); see United States v. E. I. Du Pont De Nemours & Co., 177 F.Supp. 1, 18 (N.D. Ill.1959), vacated in part on other grounds, 366 U.S. 316, 81 S.Ct. 1243, 6 L.Ed.2d 318 (1961). There was no overlapping of respondents in the three surveys so that no one respondent would be influenced in one survey by his answers to another survey. The developmental phase of the project involved preparation of questions that could be handled properly by an interviewer, correctly understood by respondents and easily answered by them. This required several drafts of questionnaires and some pretesting. The "universe" to be studied consisted of all smokers aged eighteen years and older residing in the continental United States, which the research project indicated was approximately 115,000,000 ("the smoking population"). All percentage results in the surveys represent projected percentages of the smoking population.

The three separate surveys were conducted across a national probability sample of smokers, with a sample size of approximately 500 for each survey.[78] The samples were chosen on the basis of data obtained from the Bureau of Census by a procedure which started with the selection of fifty-three localities (metropolitan areas and non-metropolitan counties), and proceeded to a selection of 100 clusters within each of these localities— each cluster consisting of about 150–250 dwelling units—and then to approximately 500 respondents within the clusters. The manner of arriving at these clusters and respondents within each cluster was described in detail. The entire procedure was designed to obtain a representative sample of all smoking adults in the country. The procedures used to avoid sampling error and errors arising from other sources,[79] the methods of processing, the instructions for the interviewers, and the approximate tolerance limits for a sample base of 500 were also described.[80] Two of the interviewers testified that they were experienced in interviewing, explained the manner in which the interviews were conducted, and stated that they did not

75. Pl.Ex. 26, p. 1; Tr. p. 456.

76. The surveys were conducted from July 30, 1960 to September 19, 1960. Pl.Ex. 26, p. 2.

77. Pl.Ex. 26, pp. 147–56; Tr. pp. 345–68.

78. There were 503 respondents in Survey A, 506 in Survey B, and 506 in Survey C. Pl.Ex. 26, p. 92.

79. Cf. Barksdale, The Use of Survey Research Findings as Legal Evidence 31–33 (1957).

80. The tolerance limits were stated in Pl.Ex. 26, p. 156. Cf. Brown Shoe Co. v. United States, 370 U.S. 294, 341–42 n. 69, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).

know the purpose of the surveys.[31] All of the original responses to the questions as reported by these interviewers were made available in court.[32]

Plaintiff also called Dr. Robert C. Sorensen as an expert in the field of survey research.[33] Dr. Sorensen stated that the project was conducted objectively and scientifically. Defendant does not deny this generally, but points to specific procedures and questions as being improper and buttresses its arguments with the testimony of its own expert, Professor Charles Winick.[34]

Defendant objects to the admission of the surveys into evidence. It first contends that the surveys are hearsay.[35] The weight of case authority, the consensus of legal writers, and reasoned policy considerations all indicate that the hearsay rule should not bar the admission of properly conducted public surveys.[36] Although courts were at first reluctant to accept survey evidence or to give it weight,[37] the more recent trend

is clearly contrary. Surveys are now admitted over the hearsay objection on two technically distinct bases. Some cases hold that surveys are not hearsay at all;[38] other cases hold that surveys are hearsay but are admissible because they are within the recognized exception to the hearsay rule for statements of present state of mind, attitude, or belief.[39] Still other cases admit surveys without stating the ground on which they are admitted.[90]

The cases holding that surveys are not hearsay do so on the basis that the surveys are not offered to prove the truth of what respondents said and, therefore, do not fall within the classic definition of hearsay.[91] This approach has been criticized because, it is said, the answers to questions in a survey designed to prove the existence of a specific idea in the public mind are offered to prove the truth of the matter contained in these answers.[92] Under this argument, when a respondent is asked to iden-

81. Tr. pp. 664–76, 680–87. Two more interviewers were present in court, and defendant stipulated that they would testify to the same effect. Tr. pp. 687–88.

82. Tr. pp. 675–76.

83. Tr. pp. 721–22a, 756–57. Dr. Sorensen is the co-author, *inter alia*, of R. C. Sorensen & T. C. Sorensen, The Admissibility and Use of Opinion Research Evidence, 28 N.Y.U.L.Rev. 1213 (1953).

84. Tr. pp. 839–41. Dr. Winick is the author of several books and articles on the subject of consumer surveys.

85. Tr. pp. 1070–71.

86. For a compilation of cases and writings, see Barksdale, op. cit. supra note 79, at 45–46 nn. 41–43; Bonynge, Trademark Surveys and Techniques and Their Use in Litigation, 48 A.B.A.J. 329 (1962).

87. Du Pont Cellophane Co. v. Waxed Prods. Co., 6 F.Supp. 859, 885 (E.D.N.Y. 1934), modified, 85 F.2d 75 (2 Cir.), cert. denied, E. I. Du Pont De Nemours & Co. v. Waxed Products Co., 299 U.S. 601, 57 S.Ct. 194, 81 L.Ed. 443 (1936); Elgin Nat'l Watch Co. v. Elgin Clock Co., 26 F.2d 376 (D.Del.1928).

88. United States v. 88 Cases, 187 F.2d 967, 974 (3 Cir.), cert. denied, 342 U.S. 861, 72 S.Ct. 88, 96 L.Ed. 648 (1951);

Household Fin. Corp. v. Federal Fin. Corp., 105 F.Supp. 164, 166 (D.Ariz. 1952); People v. Franklin Nat'l Bank, 200 Misc. 557, 105 N.Y.S.2d 81 (Sup. Ct.1951), rev'd on other grounds, 281 App.Div. 757, 118 N.Y.S.2d 210 (2d Dep't), modified, 305 N.Y. 453, 113 N.E.2d 796 (1953), rev'd on other grounds, 347 U.S. 373, 74 S.Ct. 550, 98 L.Ed. 767 (1954).

89. Miles Labs., Inc. v. Frolich, 195 F.Supp. 256, 262 (S.D.Cal.), aff'd per curiam, 296 F.2d 740 (9 Cir. 1961), cert. denied, 369 U.S. 865, 82 S.Ct. 1030, 8 L.Ed.2d 84 (1962); Marcalus Mfg. Co. v. Watson, 156 F.Supp. 161, 164 (D.D.C.1957), aff'd, 103 U.S.App.D.C. 299, 258 F.2d 151 (1958); see American Co-op. Serum Ass'n v. Anchor Serum Co., 153 F.2d 907 (7 Cir.), cert. denied, 329 U.S. 721, 67 S.Ct. 57, 91 L.Ed. 625 (1946).

90. E.g., Sunbeam Corp. v. Sunbeam Furniture Corp., 134 F.Supp. 614, 619 (N.D.Ill. 1955).

91. E.g., United States v. 88 Cases, 187 F.2d 967, 974 (3 Cir.), cert. denied, 342 U.S. 861, 72 S.Ct. 88, 96 L.Ed. 648 (1951); see Scholle v. Cuban-Venezuelan Oil Voting Trust, 285 F.2d 318, 321–22 (2 Cir. 1960).

92. See 37 Minn.L.Rev. 385, 387 (1953).

tify the brand of an unmarked lighter, the answer of each respondent who thinks the lighter is a Zippo is regarded as if he said, "I believe that this unmarked lighter is a Zippo." Since the matter to be proved in a secondary meaning case is respondent's belief that the lighter shown him is a Zippo lighter, a respondent's answer is hearsay in the classic sense. Others have criticized the non-hearsay characterization, regardless of whether surveys are offered to prove the truth of what respondents said, because the answers in a survey depend for their probative value on the sincerity of respondents.[93] One of the purposes of the hearsay rule is to subject to cross-examination statements which depend on the declarant's narrative sincerity. See Morgan, Hearsay Dangers and the Application of the Hearsay Concept, 62 Harv.L.Rev. 177 (1948). The answer of a respondent that he thinks an unmarked lighter is a Zippo is relevant to the issue of secondary meaning only if, in fact, the respondent really does believe that the unmarked lighter is a Zippo. Under this view, therefore, answers in a survey should be regarded as hearsay.

█ Regardless of whether the surveys in this case could be admitted under the non-hearsay approach, they are admissible because the answers of respondents are expressions of presently existing state of mind, attitude, or belief. There is a recognized exception to the hearsay rule for such statements, and under it the statements are admissible to prove the truth of the matter contained therein.[94]

Even if the surveys did not fit within this exception, well reasoned authority justifies their admission under the following approach: the determination that a statement is hearsay does not end the inquiry into admissibility; there must still be a further examination of the need for the statement at trial and the circumstantial guaranty of trustworthiness surrounding the making of the statement.[95] This approach has been used to justify the admissibility of a survey.[96] Necessity in this context requires a comparison of the probative value of the survey with the evidence, if any, which as a practical matter could be used if the survey were excluded. If the survey is more valuable, then necessity exists for the survey, i. e., it is the inability to get "evidence of the same value" which makes the hearsay statement necessary.[97] When, as here, the state of mind of the smoking population (115,000,000 people) is the issue, a scientifically conducted survey is necessary because the practical

93. See Miles Labs., Inc. v. Frolich, 195 F.Supp. 256, 262 (S.D.Cal.), aff'd per curiam, 296 F.2d 740 (9 Cir. 1961), cert. denied, 369 U.S. 865, 82 S.Ct. 1030, 8 L. Ed.2d 84 (1962); Note, Public Opinion Surveys as Evidence: The Pollsters Go to Court, 66 Harv.L.Rev. 498, 502–03 (1953).

94. Note 89 supra and accompanying text; see Scholle v. Cuban-Venezuelan Oil Voting Trust, 285 F.2d 318, 321–322 (2 Cir. 1960); McCormick, Evidence § 268 (1954); cf. United States v. Annunziato, 293 F.2d 373, 377–378 (2 Cir.), cert. denied, 368 U.S. 919, 82 S.Ct. 240, 7 L.Ed. 2d 134 (1961).

95. Dallas County v. Commercial Union Assur. Co., 286 F.2d 388 (5 Cir. 1961); G. & C. Merriam Co. v. Syndicate Publishing Co., 207 F. 515 (2 Cir. 1913), appeal dismissed, 237 U.S. 618, 35 S.Ct. 708, 59 L.Ed. 1148 (1915); 5 Wigmore, Evi-

dence §§ 1420–22 (3d ed. 1940); see Scholle v. Cuban-Venezuelan Oil Voting Trust, supra note 94, at 321; cf. 2 Morgan, Basic Problems of Evidence 254 (1961).

96. Miles Labs., Inc. v. Frolich, 195 F.Supp. 256, 262 (S.D.Cal.) (alternative holding), aff'd per curiam, 296 F.2d 740 (9 Cir. 1961), cert. denied, 369 U.S. 865, 82 S.Ct. 1030, 8 L.Ed.2d 84 (1962); see United States v. Aluminum Co. of America, 35 F.Supp. 820, 823–824 (S.D.N.Y.1940), rev'd in part on other grounds, 148 F.2d 416 (2 Cir. 1945).

97. 5 Wigmore, op. cit. supra note 95, § 1421; see Dallas County v. Commercial Union Assur. Co., 286 F.2d 388, 396 (5 Cir. 1961):
"[I]t seems impossible that the testimony of any witness would have been as accurate and reliable as the [hearsay] statement * * *."

alternatives do not produce equally probative evidence. With such a survey, the results are probably approximately the same as would be obtained if each of the 115,000,000 people were interviewed.[98] The alternative of having 115,000,000 people testify in court is obviously impractical. The alternatives of having a much smaller section of the public testify (such as eighty witnesses)[99] or using expert witnesses to testify to the state of the public mind[100] are clearly not as valuable because the inferences which can be drawn from such testimony to the public state of mind are not as strong or as direct as the justifiable inferences from a scientific survey.

The second element involved in this approach is the guaranty of trustworthiness supplied by the circumstances under which the out-of-court statements were made. A logical step in this inquiry is to see which of the hearsay dangers are present.[101] With regard to these surveys: there is no danger of faulty memory; the danger of faulty perception is negligible because respondents need only examine two or three cigarette lighters at most; the danger of faulty narration

is equally negligible since the answers called for are simple. The only appreciable danger is that the respondent is insincere. But this danger is minimized by the circumstances of this or any public opinion poll in which scientific sampling is employed, because members of the public who are asked questions about things in which they have no interest have no reason to falsify their feelings.[102] While the sampling procedure substantially guarantees trustworthiness insofar as the respondent's sincerity is concerned, other survey techniques substantially insure trustworthiness in other respects. If questions are unfairly worded to suggest answers favorable to the party sponsoring the survey, the element of trustworthiness in the poll would be lacking. The same result would follow if the interviewers asked fair questions in a leading manner.[103] Thus, the methodology of the survey bears directly on trustworthiness, as it does on necessity. Since the two elements of necessity and trustworthiness are satisfied, I would admit these surveys under this approach to the hearsay rule, even apart from the state of mind exception.[104]

98. See Sprowls, The Admissibility of Sample Data Into a Court of Law: A Case History, 4 U.C.L.A.L.Rev. 222 (1957).

99. Life Savers Corp. v. Curtiss Candy Co., 87 F.Supp. 16, 17 (N.D.Ill.1949), aff'd, 182 F.2d 4 (7 Cir. 1950).

100. Falcon Indus., Inc. v. R. S. Herbert Co., 128 F.Supp. 204, 209 (E.D.N.Y. 1955).

101. See United States v. National Homes Corp., 196 F.Supp. 370, 372–73 (N.D. Ind.1961). See generally Morgan, Hearsay Dangers and the Application of the Hearsay Concept, 62 Harv.L.Rev. 177 (1948).

102. Note, Public Opinion Surveys as Evidence: The Pollsters Go to Court, 66 Harv.L.Rev. 498, 503–04 (1953); 37 Minn.L.Rev. 385, 388 (1953).

103. See American Thermos Prods. Co. v. Aladdin Indus., Inc., 207 F.Supp. 9, 20 (D.Conn.1962); Recommended Procedures for the Trial of Protracted Cases, 25 F.R.D. 351, 429 (1960).

104. Irvin v. State, 66 So.2d 288, 291–92 (Fla.1953), cert. denied, 346 U.S. 927, 74 S.Ct. 316, 98 L.Ed. 419 (1954), raises a possible objection not stressed by defendant—"multiple hearsay." The multiple hearsay argument is as follows: when answers made by respondents to interviewers are admissible under a hearsay exception, the interviewers can testify to these answers; but when the interviewers themselves do not testify but instead "tell" these answers to another person in the market research organization who then testifies as to the answers, this testimony is inadmissible hearsay because the witness is relating what the interviewers told him rather than what respondents in the survey told him. I conclude that this argument should not preclude the admission of a properly conducted survey, possibly because the business entries exception to the hearsay rule covers the transmission of the answers from the interviewers to other people in the organization, at least where the organization involved is in the business of conducting and reporting on surveys, see 52 Mich.L.Rev. 914 (1954),

Defendant's next objection to the surveys is that they should not have been conducted in respondents' homes but in stores, the actual places of purchase. While it may be that in general the store is the best place to measure the state of mind at the time of purchase,[105] it would be virtually impossible to obtain a representative national sample if stores were used.[106] An interview at a respondent's home is probative of his state of mind at the time of purchase,[107] although the deviation from the actual purchase situation should be considered in weighing the force of this evidence. Therefore, the surveys are not inadmissible merely because they were conducted in homes.

Defendant also objects to the surveys on the ground that they measured only the popularity of Zippo, as compared with the popularity of Rogers, and that this is not relevant to secondary meaning.[108] However, I find that, by and large, the surveys did, as Dr. Sorensen testified, test brand identification and not brand popularity.[109] They are, therefore, not incompetent because of the small elements of popularity which may have crept in, although that possibility should be considered in the weight to be given their results.[110]

Defendant's next objection is to Survey C. In that survey, 34.7 per cent of respondents thought a Rogers lighter was a Zippo lighter,[111] and plaintiff argues that this is probative of likelihood of confusion between the two lighters. However, respondents were not shown a Rogers display card when they made their mistaken identification.[112] Therefore, defendant contends that the percentage of people who would mistakenly identify a Rogers lighter as a Zippo lighter would be smaller if the Rogers lighter were shown to them on a Rogers display card.[113] This argument is probably correct. This does not mean, however, that the results of Survey C are inadmissible to prove that the appearance of the Rogers lighter is likely to confuse people into thinking that it is a Zippo lighter.

Defendant's argument is implicitly based on two assumptions: (1) that use of the Rogers display card in the interviews would have caused a great number of the respondents who thought the Rogers lighter was a Zippo lighter to give different answers; and (2) that the number left who, even after a display card was shown to them, would still confuse the Rogers lighter with a Zippo lighter would be statistically insignificant.[114] However, these assumptions at best are too speculative to require exclusion of Survey C. Moreover, they are contradicted by other answers in Survey C, which show that about one-half of respondents who mistakenly thought that the Rogers lighter was a Zippo lighter actually saw something stamped on the bottom of the lighter (where the Rogers name was imprinted),[115] and that over one-third of those who thought the Rogers lighter was a Zippo lighter actually saw the Rogers name stamped on the lighter.[116] These results certainly give rise to the inference that if the Rogers display card had been shown to respondents, a significant number of people would have thought the Rogers lighter was a Zippo lighter anyway: although exposed to the display card, some would

---

29 N.Y.U.L.Rev. 751 (1954), or because considerations of necessity and trustworthiness justify an exception for the "second stage" of hearsay as well as for the original answers.

105. Tr. p. 842. But see Tr. pp. 726–27, 850–51.

106. Tr. pp. 958–59.

107. Cf. Tr. p. 732.

108. Tr. p. 428.

109. Tr. pp. 730–37.

110. See p. 687 infra.

111. Pl.Ex. 26, p. 73.

112. Pl.Ex. 26, p. 75.

113. Tr. pp. 421–23a; see p. 674 supra.

114. One of plaintiff's witnesses testified that a result is statistically insignificant when it is so small that it could have been reached by accident. Tr. p. 366.

115. Pl.Ex. 26, p. 82.

116. Pl.Ex. 26, p. 84.

not have actually perceived the Rogers name,[117] and others would have seen the Rogers name but would nonetheless think that the lighter was made by Zippo. Therefore, Survey C is not excluded. However, its weight on the issue of likelihood of confusion is less than it would be had a display card been used, and had the same number of respondents nonetheless identified the Rogers lighter as a Zippo lighter. See W. E. Bassett Co. v. H. C. Cook Co., 164 F.Supp. 278, 285 (D.Conn.1958).

■ Defendant has other objections to admissibility of the surveys, e. g., that a survey is not the best way to prove secondary meaning,[118] but none of these merit further discussion.[119] Surveys A, B, and C were scientifically conducted by a competent and professional research firm, substantially in accordance with the recommendations of Recommended Procedures for the Trial of Protracted Cases, 25 F.R.D. 351, 415–430 (1960). I conclude, therefore, that the surveys are admissible to show secondary meaning for the shape and appearance of the Zippo standard and slim-lighters and likelihood of confusion between these lighters and their Rogers counterparts.

## IV

The elements of plaintiff's case required to be proved will be considered against the background of the applicable law discussed above (Part II).

1. The first element—imitation—is clearly established. While Rogers does not itself copy the Zippo lighters, the lighters it purchases and then markets are, as indicated above,[120] copies of the Zippo lighters. Plaintiff now claims that its lighter has been unfairly copied only as to its external shape and appearance and the windscreen. Plaintiff originally based its claim of unfair competition on alleged copying of other features of its lighter, such as the cover-holding cam, the ears holding the flint wheel, the cam lever spring, and the cutout at the bottom of its internal case. However, it conceded at the close of the trial that these features were functional and, therefore, not protected against copying.[121] Even so limited, I find that the Rogers "720" models, in both their standard and slim-lighter sizes, imitate their Zippo counterparts.

2. The second element of plaintiff's case is secondary meaning. This term has been called "a triumph of unintended obfuscation"[122] since what it describes is whether a feature of an article, such, as here, its shape or appearance, has acquired a special significance which is anything but secondary in the mind of the purchaser, i. e., identification with source, and impulse to buy because of source.[123]

Turning first to the standard model, Survey A is the most important evidence as to the secondary meaning of the shape and appearance of this Zippo lighter. When shown an unmarked Zippo standard, 42.6 per cent of respondents in Survey A were "certain" it was a Zippo lighter. Of the 42.6 per cent who identified the Zippo lighter with its source, a substantial number clearly relied upon its shape, size, or appearance as the rea-

---

117. Tr. p. 982.

118. Tr. pp. 432–34, 784–85.

119. As to the superior value of the surveys, see p. 683 supra. In any event, the use of surveys should not be precluded because other evidence is available or used, as was done here. Tr. pp. 691–720. Three witnesses testified as to actual confusion. See United States v. 38 Dozen Bottles, 114 F.Supp. 461 (D. Minn.1953).

120. See p. 674 supra.

121. Tr. pp. 789–92.

122. Kaplan & Brown, Cases on Copyright, Unfair Competition, and Other Topics 490 (1960).

123. See G. & C. Merriam Co. v. Saalfield, 198 F. 369, 373 (6 Cir. 1912), modified sub. nom., Saalfield Publishing Co. v. G. & C. Merriam Co., 238 F. 1 (6 Cir.), cert. denied, 243 U.S. 651, 37 S.Ct. 478, 61 L.Ed. 947 (1917); Restatement, Torts, Explanatory Notes § 716, comment b at 560 (1938).

son for identification.[124] A relatively small percentage, 11.3 per cent, identified the unmarked Zippo standard as manufactured by someone else. 42.6 per cent is a significant percentage, indicating that a substantial number of people identify the shape and appearance of the lighter with Zippo. Defendant, as indicated above,[125] minimizes the weight to be given to this survey's conclusions. Its most persuasive argument in this context is that there is a large element of guesswork indulged in by respondents. A similar point was made by Judge Moore in Norwich Pharmacal Co. v. Sterling Drug, Inc., 271 F.2d 569 (2 Cir. 1959), cert. denied, 362 U.S. 919, 80 S.Ct. 671, 4 L.Ed.2d 739 (1960), where he said (271 F.2d at p. 572) that the results of the public opinion survey in that case " * * * indicate no more than the popularity of [the product]." It is interesting to note that the survey in Norwich was conducted by the same firm involved in this case,[126] and that the phrasing of the key questions in the instant survey was carefully formulated to reduce the importance of the element of popularity found in the Nor-

wich survey. Thus, the first question in Survey A emphasized that respondents should not guess, and asked them to be "certain." [127] This was characterized by Mr. Simmons and Dr. Sorensen as a "hard" question designed to meet the objection made in the Norwich case.[128] To the second and third questions asked of those who were not "certain" of the brand of the unmarked Zippo lighter, another 16 per cent responded Zippo.[129] However, these questions allowed a greater possibility for guesswork. For this reason, I am not giving much weight to these answers on the issue of whether purchasers identified the Zippo lighter with its source because of its appearance, although the answers do suggest that there was such identification. However, Survey A otherwise supports this aspect of secondary meaning strongly enough, I feel, to alone justify such a finding. Also of some probative value, in my opinion, are Zippo's vigorous advertising campaign,[130] and the fact that the standard model has been sold in a quite similar form for about thirty years, and in almost identical form since 1946.[131] Accordingly, I find that this

124. Pl.Ex. 26, pp. 12–14.

125. See p. 685 supra.

126. Tr. p. 340. However, the survey questions in Norwich were not prepared by the Simmons firm. Tr. pp. 340, 391.

127. Pl.Ex. 26, p. 6. The exact question was:
"Here is a cigarette lighter. Without guessing, can you tell me what brand of lighter you are certain this is?"
The answers were:

| "Brand Name | % |
| --- | --- |
| Zippo | 42.6 |
| Ronson | 5.9 |
| Rogers | 0.1 |
| Other brands | 5.3 |
| Don't know brand | 46.1" |

128. Tr. pp. 397, 734. The question in the Norwich case was phrased as follows:
"I have here a bottle containing a prepared remedy for upset stomach. Which brand of remedy for upset stomach do you think this is?" Record on Appeal, p. 573, Norwich Pharmacal Co. v. Sterling Drug, Inc., 271 F.2d 569 (2 Cir. 1959), cert. denied, 362 U.S. 919, 80 S.Ct. 671, 4 L.Ed.2d 739 (1960).

129. Pl.Ex. 26, pp. 8, 10. The second question was:
"Can you tell me, then, what brand of lighter this most probably is?"
7.4% of respondents answered Zippo, 5.7% answered Ronson, and none answered Rogers. The third question was:
"Here is a list of manufacturers which might help you remember which one, if any, may have made this lighter. After looking at this list, will you tell me which one, if any, you think made this lighter?"
The responses, inter alia, were Zippo, 8.6%, Ronson, 4.8%, and Rogers, 1.5%.

130. See p. 673 supra; cf. Chas. D. Briddell, Inc. v. Alglobe Trading Corp., 194 F.2d 416, 418–419 (2 Cir. 1952); General Time Instruments Corp. v. United States Time Corp., 165 F.2d 853, 854–855 (2 Cir.), cert. denied, 334 U.S. 846, 68 S.Ct. 1515, 92 L.Ed. 1770 (1948).

131. See p. 672 supra. During World War II, Zippo's annual sales of standard lighters grew from approximately 408,000 to approximately 2,930,000. That the Zippo lighter was well known to servicemen is apparent from references in liter-

element of secondary meaning has been established.

The other aspect of secondary meaning required is that the source of the product in some degree motivates the purchase, i. e., the consumer cares about who made the product as distinguished from the pleasing appearance of the product itself. Crescent Tool Co. v. Kilborn & Bishop Co., 247 F. 299 (2 Cir. 1917); Restatement, Torts, Explanatory Notes § 741(b), comment *h* at 627 (1938). Here again the evidence of Survey A is crucial. With the fourth question of Survey A, a respondent was handed two lighters, one with the Zippo name on the bottom and the other with the Rogers name. He was then accurately told that one lighter was manufactured by Zippo and one by Rogers, and instructed to keep the one he desired.[132] 66.9 per cent of respondents preferred the Zippo, compared to 28.7 per cent who chose the Rogers. A substantial portion of the former group based their choice on the fact that the Zippo company was associated with the lighter they chose.[133] This ratio is clearly probative of the importance of source to respondents. In addition, there is similar probative value in some of the answers to the questionnaires sent by Zippo to those who had sent Rogers lighters to it for repair.[134] Taking into account all the arguments mentioned above affecting the weight of the survey evidence, I find that secondary meaning in

both its aspects has been proven as to the standard Zippo lighter as a whole.

In this connection, it is important to point out that the copied features of the lighter break down into two categories: those associated with the lighter when closed (its external shape and appearance) and those discernible when the lighter is open (e. g., the windscreen). This division is significant with regard to the issue of functionality, as discussed below.[135] On the record before me, I cannot say that plaintiff has met its burden of proof for secondary meaning specifically with regard to each category, but has only proved secondary meaning for both categories of the lighter's features together without differentiating between them. This is so because Survey A did not call for answers specifically directed to each category. Interviewers gave a respondent an unmarked Zippo standard and allowed the respondent to examine it in any way he chose. The interviewers' notes[136] indicate that a substantial number of respondents actually opened the lighter before stating whether they recognized the brand. Therefore, it is impossible to determine whether most respondents would have identified the lighter as a Zippo if they had been compelled to limit examination solely to the external shape and appearance of the lighter when closed or solely to its shape and appearance when open.[137] Accordingly, I cannot find that secondary meaning has been proved for

---

ature. E.g., James Jones, The Thin Red Line 53 (Charles Scribner's Sons 1962) ("Storm * * * tried to light his field stove with wet matches. * * * Finally he managed it with a borrowed Zippo. * * *").

132. Pl.Ex. 26, p. 28. The exact instruction was:
   "These two lighters were made by two different manufacturers. One is a Zippo and the other is a Rogers. After you have examined them, you may keep whichever you prefer."

133. Pl.Ex. 26, pp. 30–32.

134. E.g., Pl.Ex. 23, answer in questionnaire of A. O. Nuebeck ("I wouldn't have any other kind, Zippo is the most

dependable and the best lighter on the market.") and answer of J. M. MacCammon in letter attached to questionnaire ("I have purchased Zippo lighters for approximately 15 years and would not purchase any other make.").

135. See p. 695 infra.

136. By stipulation of the parties, the interviewers' notes were submitted to the court after the actual hearing.

137. It is true that some answers to questions in Survey A indicate that some respondents recognized the model as a Zippo because of the external shape and appearance, but how many did so solely because of external shape and appearance cannot be ascertained.

either category of features alone, although I do find that secondary meaning has been proved for the shape and appearance of the lighter as a whole.

With regard to the Zippo slim-lighter, the situation is different. Plaintiff began marketing the slim-lighter in June 1956. By contrast, it began marketing the Zippo standard lighter on a substantial scale in 1934, and, as indicated above, although the appearance of this model was changed somewhat over the years, it has undergone no appreciable change since 1946.[138] Defendant began selling its Rogers slim-lighter in the fall of 1957. Plaintiff has the burden of proving that the appearance of the slim-lighter had achieved secondary meaning within the relatively short period of a little over a year, when defendant began to sell its lighter. See Crescent Tool Co. v. Kilborn & Bishop Co., 247 F. 299, 300 (2 Cir. 1917); Remington Research, Inc. v. Modern Aids, Inc., 170 F.Supp. 7, 11 (S.D.N.Y.1959). Plaintiff appears to dispute this proposition since it now argues that the shape of the slim-lighter is so like the standard that any secondary meaning attaching to the standard over the years prior to 1956 would, of necessity, immediately attach to the slim-lighter as well.[139] However, this point is not well taken. While there is similarity between the Zippo slim-lighter and standard models (e. g., the windscreen), the appearance of the two lighters is, in my opinion, sufficiently different to negate transferral of secondary meaning from the standard to the slim-lighter. The difference in dimensions [140] is striking, and the slim-lighter must stand on its own feet with regard to any secondary meaning.

Apart from the alleged carry-over from the standard model, plaintiff relies principally on Survey B to prove secondary meaning for the slim-lighter.[141] The principal questions in this survey, which dealt with the slim-lighter, were identical to those in Survey A. I find that Survey B is important evidence, as was Survey A, but, for various reasons, is far less probative of the existence of secondary meaning. First, with an unmarked Zippo slim-lighter, only 25 per cent of respondents (as against 42.6 per cent for the unmarked Zippo standard) were "certain" that it was a Zippo lighter.[142] It is true, as plaintiff points out, that in a recent decision a court accepted 25 per cent as "credible evidence of confusion on the part of a substantial percentage of the approximately 1,000 persons interviewed * * *."[143] However, for reasons hereafter set forth, the significance of the 25 per cent in this case is altogether different. Second, 8.9 per cent of the respondents were "certain" that the unmarked Zippo slim-lighter was a Ronson, and another 15.2 per cent attributed the lighter to Ronson although they were not "certain."[144] It is conceded by both parties that Ronson makes no lighter similar in appearance to either the Zippo or Rogers standard or slim-lighter.[145] This remarkably high percentage (24.1) affirmatively and incorrectly identifying the Zippo slim-lighter with one well-known source was almost equal to the percentage (25) correctly "certain" that it was a Zippo lighter. This indicates the greater possibil-

138. See text accompanying note 7 supra.

139. See Plaintiff's Main Brief, p. 74. This is a shift from the position taken by plaintiff at trial. Tr. pp. 193, 196.

140. See p. 673 supra.

141. It does not appear from the record whether any of the questionnaires dealt with the slim-lighter rather than the standard. Although the questionnaires were primarily offered to prove likelihood of confusion rather than secondary meaning, the answers to a few of them,

as indicated above, were probative of secondary meaning for the standard. It should also be noted that plaintiff's evidence of advertising expenditures does not break down the amounts spent to popularize the slim-lighter.

142. Pl.Ex. 26, p. 44.

143. Seven-Up Co. v. Green Mill Beverage Co., 191 F.Supp. 32, 36 (N.D.Ill.1961).

144. Pl.Ex. 26, pp. 46, 48.

145. Tr. pp. 1021, 1064.

ity for guesswork with a shape that had not yet achieved a strong identification with source.[146] Third, with the slim-lighter shape, the timing of the survey acquires great significance. The crucial date for Zippo to show secondary meaning is the fall of 1957, when it had been selling the slim-lighter for only a little over a year. The field work in the survey was accomplished in the period from July 30, 1960 to September 19, 1960, almost three years later. It is logical to assume that after those three years, with Zippo popularizing the slim-lighter in the interim, the percentages of respondents correctly identifying the shape would be substantially greater in 1960 than in 1957, when Rogers first began to compete. The 25 per cent who were "certain" that the slim-lighter was a Zippo lighter would undoubtedly have been less in 1957. Finally, it should be noted that on the key question of impulse to buy because of source, as compared to identification of source, Survey B, unlike Survey A, did not include a question which allowed respondents to choose between two lighters, one clearly marked Zippo and the other clearly marked Rogers.[147]

Under all of these circumstances, I believe that Survey B is not sufficiently

probative of secondary meaning for Zippo's slim-lighter for plaintiff to have met its burden. Accordingly, I find that secondary meaning has not been established for the Zippo slim-lighter as of the time Rogers began to sell its own slim-lighter model.

3. The next element of plaintiff's case [148] is that the Rogers lighter is likely to cause prospective purchasers to regard it as a Zippo lighter. Plaintiff claims that this likelihood of confusion is established for the standard model principally by Survey C and the questionnaires. In Survey C, respondents were handed a standard Rogers lighter with all of its identifying marks, including the name on the bottom, and asked to identify its brand. 34.7 per cent of respondents thought it was a Zippo lighter, and only 14.3 per cent identified it as a Rogers.[149] This would indicate that a substantial number of persons might confuse the Zippo and Rogers standard lighters because of their physical attributes, despite the appearance of the brand name on the lighters. Defendant's objections to the weight of this evidence must, of course, be seriously regarded, particularly its argument that no such confusion would exist in the store at the time of purchase because

---

146. The comparable answers in Survey A indicated that 16.4% of respondents attributed the Zippo standard lighter to Ronson, although only 5.9% were "certain." While this total is not small, nevertheless, as against a hard-core of 42.6% "certain" (and correctly so) that the standard was a Zippo lighter, it does not detract as much from the weight to be given that 42.6%.

147. Cf. note 132 supra.

148. In view of the finding, see p. 674 supra, that Rogers knew, when it began to import the allegedly offending lighters, that they closely resembled the Zippo lighters and the inferences that can be drawn therefrom, it may be that the burden of proof on the issue of likelihood of confusion shifts from plaintiff to defendant. See Mastercrafters Clock & Radio Co. v. Vacheron & Constantin-Le Coultre Watches, Inc., 221 F.2d 464, 467 (2 Cir.), cert. denied, 350 U.S. 832, 76 S.Ct. 67,

100 L.Ed. 743 (1955); Flint v. Oleet Jewelry Mfg. Co., 133 F.Supp. 459, 463 (S.D.N.Y.1955); cf. Norwich Pharmacal Co. v. Sterling Drug, Inc., 271 F.2d 569, 572–573 (2 Cir. 1959), cert. denied, 362 U.S. 919, 80 S.Ct. 671, 4 L.Ed.2d 739 (1960). However, it is not necessary to explore this question further since, as indicated below, plaintiff has established likelihood of confusion.

149. Pl.Ex. 26, p. 76. The exact question was:
"Here is a cigarette lighter. Please look at it. Can you tell me what brand of lighter this is?"
The answers were:

| "Brand Named | % |
| --- | --- |
| Zippo | 34.7 |
| Rogers | 14.3 |
| Ronson | 7.2 |
| Other brands | 4.7 |
| Don't know brand | 39.1" |

Rogers lighters are sold from display cards bearing the name "Rogers." [150] This contention is buttressed by the fact that almost all of those who did correctly identify the Rogers lighter did so because they saw the brand name on the bottom,[151] and the brand name would be more conspicuous on the display card. However, it is difficult to get away from the fact that the number of confused respondents was almost two and one-half times greater than those who recognized a Rogers as a Rogers, and a good portion of the confusion was due to the shape and style of the Rogers lighter.[152]

In addition, the answers to questionnaires discussed above [153] clearly indicate that a substantial number of the consumers who sent Rogers lighters to Zippo for repairs were confused by the similarity of the two brands, particularly by their shape and appearance.[154] A total of 191 erroneous returns of this sort is a considerable number, even after making allowance for those who did not themselves purchase the lighter (e. g., received it as a gift) or those who knew that they were taking advantage of Zippo's free repair policy.[155] Evidence of likelihood of confusion accepted as significant in other cases does not appear to be more convincing. See, e. g., Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc., 281 F.2d 755 (2 Cir. 1960) (thirteen letters sent to plaintiff because of defendant's advertisement). Defend-

ant argues that plaintiff's evidence on this point is insufficient, since no person using ordinary care could be confused with the name "Rogers" imprinted on the bottom of a Rogers lighter. Defendant's assumption that the unwary purchaser is not protected is open to question.[156] But, in any event, I do not think warranted the further necessary assumption that the greater part of the 34.7 per cent who thought the Rogers lighter was a Zippo lighter or the 191 who returned a Rogers to Zippo were negligent. Such wholesale disregard of confusion does not seem justified.

On all the evidence then, I find that plaintiff has established the likelihood of confusion—indeed actual confusion— between the Zippo and Rogers standard lighters.[157]

4. The next element plaintiff must prove is that the copied features of its lighter are nonfunctional. But functional in this context can have many meanings. It can mean only those physical features of an article absolutely necessary to its use, e. g., the cutting edge of a razor blade as distinguished from its color, shape, or design. There is support for this strictly utilitarian view. For example, in Haeger Potteries, Inc. v. Gilner Potteries, 123 F.Supp. 261 (S.D. Cal.1954), the Court enjoined the copying of plaintiff's distinctive art pottery ash tray because, *inter alia,* the copied

---

150. However, answers to two questionnaires, Pl.Ex. 23 (answers of Lee Rice and William Tarbox), and the testimony of Richard Gillard, Tr. pp. 693–95, indicate that *at the time of purchase* they thought the Rogers lighter was a Zippo. Mr. Gillard also testified that the Rogers lighter was sold to him in a Zippo box. Tr. p. 701.

151. Pl.Ex. 26, p. 78.

152. Pl.Ex. 26, pp. 78–79.

153. See p. 675 supra.

154. Pl.Exs. 23, 25. Some typical answers were:
    "I assumed it a Zippo because it was the size and the same build."
    "The design—it looked like a Zippo."
    "Appearance."

"It had very similar features."
"Because of its shape."

155. See Pl.Exs. 23–25.

156. See Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc., 281 F.2d 755, 761 (2 Cir. 1960); Wesson v. Galef, 286 F. 621, 625 (S.D.N.Y.1922). But see West Point Mfg. Co. v. Detroit Stamping Co., 222 F.2d 581, 595 (6 Cir.), cert. denied, 350 U.S. 840, 76 S.Ct. 80, 100 L.Ed. 749 (1955).

157. Since I have found no secondary meaning for the Zippo slim-lighter at the time when Rogers began to sell its slim-lighter model, it is not necessary to deal with the likelihood of confusion in the slim-lighters. In any event, it should be noted that in Survey C inquiries were made only with regard to the standard model.

features were nonfunctional. It said (at p. 271):

> "Whether an ash tray is round, oblong, egg-shaped, square, or of free form, makes no difference as to its utility or usefulness in holding ashes. * * * It is the utility to hold ashes, and not a precise shape or form, which is 'the natural and characteristic action' of an ash tray."

See McGill Mfg. Co. v. Leviton Mfg. Co., 43 F.2d 607, 608 (E.D.N.Y.1930).

A broader definition of functionality is contained in the Restatement of Torts. Section 742 thereof states (at p. 629):

> "A feature of goods is functional * * * if it affects their purpose, action or performance, or the facility or economy of processing, handling or using them; it is non-functional if it does not have any of such effects.

> "Comment:

> "a. A feature of goods, or of their wrappers or containers, may be functional because it contributes to efficiency or economy in manufacturing them or in handling them through the marketing process. It may be functional, also, because it contributes to their utility, to their durability or to the effectiveness or ease with which they serve their function or are handled by users. * * *

> "A feature is non-functional if, when omitted, nothing of substantial value in the goods is lost. * * * "

In Pope Automatic Merchandising Co. v. McCrum-Howell Co., 191 F. 979, 40 L.R.A.,N.S., 463 (7 Cir. 1911), cert. denied, 223 U.S. 730, 32 S.Ct. 527, 56 L.Ed. 633 (1912), defendant appealed from a preliminary injunction prohibiting it from making and selling a vacuum cleaner identical to plaintiff's in mechanical principles, arrangement of parts, form, and color, but prominently displaying defendant's name. Plaintiff did not deny defendant's right to use the exact combination of interior parts if defendant had used a different form and color for the exterior parts. In setting aside the injunction on the ground that the shape of the vacuum cleaner was functional, the Court stated (191 F. at p. 981):

> "In short, [plaintiff] uses the most efficient and most economically manufactured form into which the mechanical combination can probably be embodied. * * * If [defendant] should be required to give a square or hexagonal or other cylindrical form to the outer surface of the casings, considerations of cost of the superfluous material and labor might prevent them from competing with [plaintiff] in the manufacture and sale of a mechanism that was equally open to both."

The concept of functionality may also be expanded to include anything which contributes to consumer appeal, i. e., a feature which gives the consumer a "substantial reason for purchasing the goods, rather than merely distinguishing them."[158] In Pagliero v. Wallace China Co., 198 F.2d 339 (9 Cir. 1952), the Court refused to enjoin defendant from copying ornamental designs on hotel china dishes because it classified them as functional. The Court recognized that one of the "essential selling features" of hotel china is its design, and stated (at p. 344): "[F]rom the standpoint of the purchaser china satisfies a demand for the aesthetic as well as for the utilitarian, and the design on china is, at least in part, the response to such demand." In J. C. Penney Co. v. H. D. Lee Mercantile Co., 120 F.2d 949 (8 Cir. 1941), a similar test of functionality was applied to a "bib-pocket" design on overalls, where the Court stated (at p. 954):

> "[T]he term 'functional' is not to be treated as synonymous with the literal signification of the term 'utilitarian'. A design, for example, may

158. See Developments in the Law—Trade-Marks and Unfair Competition, 68 Harv.L.Rev. 814, 856 (1955).

not be utilitarian in a technical sense, but it may nevertheless be functional in the sense that it will contribute materially to a general sale of the goods."

Cf. West Point Mfg. Co. v. Detroit Stamping Co., 222 F.2d 581 (6 Cir.), cert. denied, 350 U.S. 840, 76 S.Ct. 80, 100 L.Ed. 749 (1955); Vaughan Novelty Mfg. Co. v. G. G. Greene Mfg. Corp., 202 F.2d 172 (3 Cir.), cert. denied, 346 U.S. 820, 74 S.Ct. 34, 98 L.Ed. 346 (1953).

The foregoing analysis of different interpretations of functionality does not exhaust the field.[159] Nor is it meant to imply that the cases fall into clear-cut lines of authority. For example, the comment to the Restatement rule [160] can be interpreted to inject the element of consumer appeal into the functionality concept when it states:

"When goods are bought largely for their aesthetic value, their features may be functional because they definitely contribute to that value and thus aid the performance of an object for which the goods are intended."

Moreover, discussion of functionality in cases in the Second Circuit has not always been in the same terms as the definitions noted above. It is true that in an early opinion, Judge Learned Hand, sitting as a District Judge, apparently formulated the very broad definition of functionality later adopted in Pagliero v. Wallace China Co. and J. C. Penney Co. v. H. D. Lee Mercantile Co., supra, i. e., any feature of an article that appeals to a consumer and affects his choice is functional. In Champion Spark Plug Co. v. A. R. Mosler & Co., 233 F. 112 (S.D.N.Y.

1916), an unfair competition action involving competing spark plugs, Judge Hand specifically addressed himself to the problem of functionality. He first distinguished prior cases where injunctions against copying had been granted (and where, therefore, the copied features had been regarded as nonfunctional),[161] by pointing out (at p. 116) that in those cases:

" * * * there were features added by the defendant which could have no purpose, and, what is more to the point, no effect, except to mislead the buyer into supposing the goods were of the plaintiff's make. *They could be subtracted from the article without affecting those features which controlled the buyer's choice.*" (Emphasis added.)

He also noted that the prior Rushmore cases (where copying of the outer shell of an auto lamp or horn had been enjoined)[162] "avowedly rest[ed] on the same basis," but implicitly questioned their soundness, because the buyer of defendant's product in those cases might have chosen the auto lamp or horn in question because of its appealing design. He stated:

"To deny the second comer the right to use that design seems rather to step beyond the principle which protects only such symbols as are representative of the plaintiff's manufacture, nor does it seem an entirely adequate answer to say that the features enjoined are nonfunctional. *It is only when the mechanical operativeness of the thing is certainly all that determines the buyer's choice that such a criterion is safe.*" Ibid. (Emphasis added.)

159. See Pollack, Unfair Trading by Product Simulation: Rule or Rankle?, 23 Ohio State L.J. 74, 77 (1962); Stern & Hoffman, Public Injury and the Public Interest: Secondary Meaning in the Law of Unfair Competition, 110 U.Pa. L.Rev. 935 (1962); Comment, Protection of Appearance of Goods, 29 Rocky Mt.L. Rev. 214 (1957).

160. Restatement, Torts, Explanatory Notes § 742, comment a at 629 (1938).

161. E.g., Enterprise Mfg. Co. v. Landers, Frary & Clark, 131 F. 240 (2 Cir. 1904); see Yale & Towne Mfg. Co. v. Alder, 154 F. 37 (2 Cir. 1907).

162. Rushmore v. Badger Brass Mfg. Co., 198 F. 379 (2 Cir. 1912); Rushmore v. Manhattan Screw & Stamping Works, 163 F. 939 (2 Cir. 1908).

This analysis appears to accept the doctrine that when an aesthetic feature of an article controls the buyer's choice, the feature is "functional." This point was driven home in the Champion case itself when Judge Hand pointed out that the crucial distinction between functional and nonfunctional features was not involved in the case before him because "a buyer will not choose a spark plug because its appearance pleases his fancy." Ibid.

In later cases for the Court of Appeals, Judge Hand characterized a nonfunctional feature of an article as "minor" [163] or "nonessential." [164] In other Court of Appeals cases, the utilitarian aspect of the feature copied has been emphasized in determining whether it is functional. E. g., Speedry Prods., Inc. v. Dri Mark Prods., Inc., 271 F.2d 646, 648 (2 Cir. 1959); American Safety Table Co. v. Schreiber, 269 F.2d 255, 268, 274 (2 Cir.), cert. denied, 361 U.S. 915, 80 S.Ct. 259, 4 L.Ed.2d 185 (1959), modified, 287 F.2d 417 (2 Cir. 1961). However, in Norwich Pharmacal Co. v. Sterling Drug, Inc., 271 F.2d 569, 572 (2 Cir. 1959), cert. denied, 362 U.S. 919, 80 S.Ct. 671, 4 L.Ed.2d 739 (1960), the Court cited with apparent approval the "broad definition" of the Restatement. [165]

Clearly, then, concepts of functionality have overlapped, with different courts emphasizing different factors, undoubtedly at times because of the facts in the cases before them. For example, under the strictly utilitarian approach, copying of a china dish design would be actionable because, in the words of Haeger Potteries, Inc. v. Gilner Potteries, supra page 691, 123 F.Supp. at 271, the design of a china dish "makes no difference as to its utility or usefulness" as a dish. Yet, in Pagliero v. Wallace China Co., supra page 692, the Court held that such copying was not actionable because it applied a different test of functionality. Therefore, since the definition of functionality may be crucial, an explicit recognition of the applicable approach is necessary.

■ With precedents supporting more than one view, however, considerations of policy must enter into the choice of approach. The law of unfair competition has traditionally been a battleground for competing policies. The interest of the public in not being deceived has been called the basic policy. [166] Moreover, a plaintiff's interest in not having the fruit of his labor misappropriated should not be disregarded. [167] But there is also the

---

163. In Shredded Wheat Co. v. Humphrey Cornell Co., 250 F. 960, 964 (2 Cir. 1918), the Court said:

"It is in cases where the connotation of origin arises, not from verbal description, but only from the appearance of the article, that the trouble arises in application, because the appearance must in some way be changed, or the article must be wrapped or marked. Thus has arisen the principle often applied in this court that *minor*, or 'nonfunctional,' changes in appearance may be required, so long as the substantial elements are left in the public domain." (Emphasis added.)

164. In Crescent Tool Co. v. Kilborn & Bishop Co., 247 F. 299, 301 (2 Cir. 1917), discussed at page 677, supra, the Court stated:

"The proper meaning of the phrase 'nonfunctional,' is only this: That in such cases the injunction is usually confined to *nonessential* elements, since

these are usually enough to distinguish the goods, and are the least burdensome for the defendant to change." (Emphasis added.)

In American-Marietta Co. v. Krigsman, 275 F.2d 287, 289 (2 Cir. 1960), discussed at page 678 supra, the Court, again through Judge Hand, characterized nonfunctional as "those features of the original goods that are not in any way essential to their use." See William R. Warner & Co. v. Eli Lilly & Co., 265 U.S. 526, 531, 44 S.Ct. 615, 68 L.Ed. 1161 (1924).

165. See Columbus Plastic Prods., Inc. v. Rona Plastic Corp., 111 F.Supp. 623, 627 (S.D.N.Y.1953), also cited in Norwich.

166. See, e. g., Norwich Pharmacal Co. v. Sterling Drug, Inc., supra page 694, 271 F.2d at 570-71.

167. See American Safety Table Co. v. Schreiber, supra page 694, 269 F.2d at 271-72.

policy of encouraging competition from which the public benefits.[168] A successful plaintiff in an unfair competition action obtains a monopoly unlimited in time, greater in that sense than even that available under the patent and copyright laws;[169] on the other hand, these very laws make clear that not all monopolies are bad. However, in this case, plaintiff has already had protection under the Gimera patent, and the public "now has its inning."[170] Characterizing a feature of plaintiff's lighter as functional preserves that feature "in the public domain."[171] The Restatement of Torts, Section 742, comment a, articulates the key policy: "The determination of whether or not * * * features are functional depends upon the question of fact whether prohibition of imitation by others will deprive the others of something which will substantially hinder them in competition." Weighing all of these factors—particularly the need for and benefit of competition[172]—it seems to me that the narrowest definition of functionality should be rejected as the sole test, and that functionality should be defined more broadly. I believe that the applicable test under the decisions in this Circuit is, and should be, that a feature of goods is functional at least if it affects their purpose, action, or performance, or the facility or economy of processing, handling, or using them, and possibly

also if it affects the buyer's choice because of its pleasing appearance.

In applying this test to plaintiff's standard lighter, it is important, as noted above,[173] to distinguish between those features visible only when the lighter is open and those features which can be seen when the lighter is completely closed. As to the former category, the only feature upon which plaintiff now claims protection is the windscreen.[174] However, the record indicates from plaintiff's own witnesses that the purpose of the perforated windscreen is to provide protection for the flame against the wind while allowing sufficient air to come in to keep the flame lit, and that the holes in the windscreen are round rather than square because it is cheaper to manufacture them that way.[175] Obviously, having too many holes would greatly weaken the strength of the windscreen that also has to serve as the lever by which the inside mechanism of the lighter is pulled out of the case for fueling; similarly, the arrangement of the holes should preferably be staggered, rather than placed directly over each other, in order not to weaken the strength of the body of the windscreen. While it is true that slits in the windscreen could be used instead of round holes,[176] the number of different ways of allowing sufficient air to reach the flame for combustion purposes by using something other

168. See, e. g., Chas. D. Briddell, Inc. v. Alglobe Trading Corp., 194 F.2d 416, 418 (2 Cir. 1952).

169. See, e. g., Lucien Lelong, Inc. v. Lander Co., 164 F.2d 395, 397–398 (2 Cir. 1947); cf. Scott Paper Co. v. Marcalus Mfg. Co., 326 U.S. 249, 255–256, 66 S.Ct. 101, 90 L.Ed. 47 (1945).

170. Zippo Mfg. Co. v. Manners Jewelers, Inc., 180 F.Supp. 845, 848 (E.D.La. 1960).

171. See Shredded Wheat Co. v. Humphrey Cornell Co., 250 F. 960, 964 (2 Cir. 1918).

172. "The privilege to engage in business and to compete with others implies a privilege to copy or imitate the physical

appearance of another's goods. The public interest in competition ordinarily outweighs the interest in securing to a person the rewards of his ingenuity in making his product attractive to purchasers." Restatement, Torts, Introductory Note §§ 741–43 at 622 (1938).

173. See p. 688 supra.

174. See text accompanying note 121 supra, indicating the other features of plaintiff's lighter, visible only when it is open, upon which plaintiff has conceded it is not entitled to protection because they are functional.

175. Tr. pp. 308, 334.

176. See Pl.Ex. 21, the Ronson "Windlite" model.

than holes is very limited.[177] Although the holes could have been somewhat differently shaped or spaced, even here the number of possible arrangements, keeping in mind the economics of manufacture and the need for strength in a small area, is clearly not very great. The effect of characterizing as nonfunctional (and therefore non-copyable) these features of plaintiff's lighter (the holes and their arrangement) would be to severely limit competitive opportunities since there are so few ways of achieving the desired operating result. Under all the circumstances, I find that the windscreen and its holes affect the efficiency and economy of the manufacture and use of the lighter. It is, therefore, functional under the more limited aspects of the definition of functionality applicable in this Circuit, and it is thus unnecessary to consider whether it also affects the consumer's choice because of its pleasing appearance.

The other features of plaintiff's lighter which it claims are wrongfully copied are those comprising the lighter's external shape and appearance when closed. In deciding whether these features are functional, except for the special circumstances of this case, the question of whether the standard of consumer appeal applies in defining the functionality of a feature might well be crucial. The pleasing appearance of a pocket lighter plays a strong part in a consumer's decision to purchase, and the entire external shape and appearance of plaintiff's lighter is, if this standard is applied, probably functional. Moreover, only under this broadest standard of functionality would the complete outside shape and appearance

of the lighter when closed probably be functional. Under the somewhat narrower test, which excludes consumer appeal, these features of the lighter probably would not be functional because the shape could probably be narrower or shorter or thinner (such as the slim-lighter) without making the manufacture or use appreciably more costly or less efficient.

However, special circumstances make it unnecessary to choose between these two standards of functionality. Plaintiff has conceded that the external shape and appearance of its lighter, as originally manufactured and as it appeared in the Gimera patent, can be copied by defendant.[178] Indeed, defendant may not have needed an express concession from plaintiff in view of the language of the Supreme Court in Singer Mfg. Co. v. June Mfg. Co., 163 U.S. 169, 185, 16 S.Ct. 1002, 1008, 41 L.Ed. 118 (1896): "[O]n the termination of the patent there passes to the public the right to make the machine in the form in which it was constructed during the patent."[179] Therefore, plaintiff is compelled to rest this phase of its case upon the difference between the external shape and appearance of its lighter as portrayed in the Gimera patent and its shape and appearance today. The main difference between these two lighters is the change from severely square corners and lines to rounded corners and beveled edges and a curved top.[180] An important reason for these changes was that it was cheaper and more efficient to manufacture the outside case that way.[181] Therefore, the principal feature in the external shape of the lighter which plaintiff is compelled to

177. Cf. Speedry Prods., Inc. v. Dri Mark Prods., Inc., 271 F.2d 646, 648 (2 Cir. 1959), where Judge Moore, in holding the size and shape of a marking device to be "highly functional," stated:
"The size and shape of any hand marking device is necessarily limited. It must be small enough to be held in the hand; yet be large enough to contain a sufficient quantity of the marking fluid and be tapered enough to enable the writing point or wick to be comparatively sharp."

178. Tr. pp. 798, 815–16; cf. Tr. p. 266. It is not clear whether plaintiff's concession also covered the shape of the windscreen, although it probably did.

179. See Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 120, 59 S.Ct. 109, 83 L.Ed. 73 (1938); Lucien Lelong, Inc. v. Lander Co., 164 F.2d 395, 397 (2 Cir. 1947).

180. See text accompanying note 8 supra.

181. See text accompanying note 5 supra.

reply upon is clearly functional without applying the test of consumer appeal. Defendant would have the Court go further, and find that there is no material change at all in plaintiff's lighter from the original shape disclosed in the Gimera patent so that plaintiff's case, in effect, is conceded away.[182] I do not find that there has been no material change at all; but the main change in the external shape of the standard lighter from the original shape as portrayed in the Gimera patent was, within the context of the issues of this case, a change properly characterized as functional. Because plaintiff has not proved that the copied features of its lighter are non-functional,[183] it is not entitled to injunctive relief against copying.

This result is further buttressed by plaintiff's failure to prove secondary meaning for the external shape and appearance of the lighter when closed. Although secondary meaning for the lighter as a whole has been found (see p. 688 supra), it was there pointed out that plaintiff's proof did not sufficiently associate secondary meaning with the shape and appearance of the lighter when closed as distinguished from the features visible when open. Since the features visible when open are clearly functional, it could be said that plaintiff has not sufficiently proved secondary meaning for the only features upon which it can properly rely in seeking injunctive relief against copying, i. e., the shape and appearance of the lighter when closed. Denying relief against copying of the external shape and appearance of the lighter when closed on this ground alone

might appear unduly technical. But when this factor is coupled with the considerations of functionality and the disclosures in the Gimera patent, referred to above, the lack of proof of secondary meaning for the precise features involved merely reinforces the result.

The final question is whether, even if the copied features are functional, defendant has taken reasonable steps to set its lighter apart from plaintiff's in the public mind. This issue is what made it necessary at all to consider the questions of secondary meaning and likelihood of confusion for the standard lighter, since decision on the functionality point alone could otherwise have disposed of this aspect of the litigation. However, even though copied features are functional, if plaintiff has proved (as it has with respect to the standard lighter) secondary meaning as to any or all of these features and likelihood of confusion, the case does not end. If defendant has not taken reasonable steps to set its lighter apart from plaintiff's, plaintiff may still be entitled to relief.[184] Defendant has imprinted on the bottom of every lighter it sells the name "Rogers" and "Made in Japan." Moreover, it sells all of its lighters from display cards which bear the name "Rogers." In addition, it has offered to indicate on its display cards that the lighter being sold is not a Zippo, but a Rogers. However, in the exercise of my discretion, because of the high likelihood of confusion between these almost identical lighters, I find that defendant should take further steps to differentiate its lighter from plaintiff's, although no accounting should

182. Defendant points to admissions by plaintiff both in the testimony of its executive vice-president at the trial, Tr. pp. 200–02, and in its original complaint prior to amendment, which stated that the Zippo lighter "had a simple and distinctive appearance, which has been retained without substantial change since the beginning." This paragraph was subsequently withdrawn.

183. Although plaintiff does not contend that the burden of proof on this issue is defendant's, and in fact admits that the burden rests with it, Plaintiff's Pretrial Memorandum, pp. 8–9, my findings of functionality would be the same even if the burden were defendant's. Compare American-Marietta Co. v. Krigsman, 275 F.2d 287, 290 (2 Cir. 1960) (nonfunctionality characterized as "the first condition upon a 'secondary meaning' * * *."), with Shredded Wheat Co. v. Humphrey Cornell Co., 250 F. 960, 966 (2 Cir. 1918).

184. See p. 679 supra.

be ordered or damages awarded for past failure to take these steps. Defendant's display cards should be altered so that the name "Rogers" appears more prominently thereon. Plaintiff should again have the opportunity of accepting defendant's offer to place upon its display cards the legend that the lighter being sold is not a Zippo but a Rogers.[185] Finally, it may be that Rogers should be required to take further steps to prevent retailers from selling Rogers lighters in a Zippo box or without using a Rogers display card. Upon application, the Court would consider the propriety of imposing this further condition upon Rogers.

Because of the resolution of the main points in plaintiff's case, it does not appear necessary to examine in detail Rogers' other principal defenses. Defendant contends that the shape and appearance of the Zippo lighter has become generic, that plaintiff has "unclean hands" because it marked the Gimera patent number on lighters it now admits were not covered by the patent, and that plaintiff was guilty of laches or acquiescence. I have considered these contentions, and find that they have not been established and that the Court is not precluded, in the exercise of discretion,

from granting limited equitable relief to plaintiff.

Both parties have called to the Court's attention [186] an analogous New York case, Ronson Art Metal Works, Inc. v. Gibson Lighter Mfg. Co.,[187] and a word should be said regarding it. There, Ronson brought an action against Gibson alleging that Gibson was unfairly competing with it by selling an almost identical pocket lighter. Ronson sought an injunction and an accounting for damages. The trial court concluded that defendant had competed unfairly, relying, *inter alia,* on defendant's use of a name (Gibson) deceptively similar to Ronson in its advertising. However, the trial court did not unqualifiedly enjoin defendant from continuing to make and sell identical pocket lighters and did not require it to change the shape of the lighter in any way. The court merely required defendant to specify on its lighters and in its advertising that defendant's lighters were not the product of plaintiff. In addition, the trial court ordered an accounting for damages which plaintiff had sustained by reason of defendant's unfair competition. The accounting for damages later came to naught.[188] In the course of various appeals in Ronson, the

185. Plaintiff rejected this opportunity at trial and also argues that such action would be ineffective. Plaintiff's Main Brief, pp. 85–91; see Handler & Pickett, Trade-Marks and Trade Names—An Analysis and Synthesis: I, 30 Col.L.Rev. 168 (1930).

186. Tr. pp. 35, 1034.

187. 205 Misc. 155, 127 N.Y.S.2d 786 (Sup. Ct.1953), modified per curiam, 283 App. Div. 937, 130 N.Y.S.2d 814 (1st Dep't), aff'd mem., 283 App.Div. 1050, 131 N.Y.S. 2d 891 (1st Dep't 1954), referee's award of damages on first reference rev'd, 3 A.D.2d 227, 159 N.Y.S.2d 606 (1st Dep't 1957), order reversing referee's award of damages on second reference modified per curiam as to costs only, 8 A.D.2d 599, 184 N.Y.S.2d 391 (1st Dep't 1959), aff'd, 7 N.Y.2d 955, 198 N.Y.S.2d 610, 166 N.E.2d 189 (Ct.App.1960).

188. In Ronson Art Metal Works, Inc. v. Gibson Lighter Mfg. Co., 283 App.Div. 937, 130 N.Y.S.2d 814, 816 (1st Dep't

1954), the Appellate Division allowed the reference for ascertainment of damages to stand, but prophetically pointed out:

"It is difficult to divine how plaintiff may satisfactorily establish any claim for compensation due to defendant's unfair competition as distinguished from any detriment that might have been suffered from the entirely legitimate competition of duplicating plaintiff's product and selling it for less, but we will allow the reference * * * to stand in the event plaintiff wishes to pursue it."

Thereafter, the referee awarded damages, but this was set aside because an improper standard of damages had been used. 3 A.D.2d 227, 159 N.Y.S.2d 606 (1st Dep't 1957). On a second reference, the referee again awarded damages. On the motion to confirm the referee's report, the award of damages was denied. Denial of damages to plaintiff was thereafter affirmed by the Appellate Division, 8 A.D.2d 599, 184 N.Y.S.2d 391 (1st

.Appellate Division made absolutely clear that defendant had a right to sell a lighter that was a copy of plaintiff's lighter so long as it did not engage in deceptive marketing practices. Thus, on the first appeal, the Appellate Division stated:

"We are satisfied that there was such a combined copying of plaintiff's designs, slogans, legends and advertising art as to stimulate confusion and constitute unfair competition. *This is so even though defendants were entitled to copy the product design and their primary purpose may have been to insinuate the idea into the public mind that a duplicate of plaintiff's established product was available for a fraction of the cost, rather than to palm off their product as plaintiff's product.*" (Emphasis added.) [189]

Similarly, in a later appeal, the Court said:

"There is an area of unfair competition which does not consist of palming off, but of creating confusion. It exists where a merchant or manufacturer mingles the permissible activity of imitating a product in the public domain and selling the copy at a lower price, with such improper presentation, packaging or advertising of his product as would tend to deceive the public.

\* \* \* \* \* \*

"The proof failed to establish that the defendants' over-all sales were bottomed on the incidents of unfair competition, *and since the defendants could legitimately duplicate the plaintiff's product and sell it for less*, the net proceeds of the defendants' sales generally could not be deemed to constitute a trust in favor of the plaintiff." (Emphasis added.) [190]

It is clear from an analysis of the entire course of the Ronson litigation that it supports the result reached in this case, i. e., allowing defendant to continue to compete by selling a lighter similar in shape to plaintiff's so long as defendant takes proper steps to differentiate its lighter from plaintiff's.[191]

Other cases plaintiff relies on do not require extended comment. They apply a different standard of functionality than I believe is applicable here [192] or involve features which were apparently regarded as nonfunctional [193] or involved a crucial factor not present in this case.[194]

## V

Plaintiff also alleges a claim of trademark infringement based upon defendant's use of the words "Slim-lighter" on its display cards.[195] "Slim-lighter" was registered on April 7, 1959 by Zippo on the Supplemental Register of the United States Patent Office, appearing thereon as No. 678,809.[196] This

Dep't 1959), and by the Court of Appeals, 7 N.Y.2d 955, 198 N.Y.S.2d 610, 166 N.E.2d 189 (1960).

189. 130 N.Y.S.2d 814, 815 (1st Dep't 1954).

190. 159 N.Y.S.2d 606, 610–611 (1st Dep't 1957).

191. Since the Ronson case appears to be the closest case under New York law to the facts involved here, reference to New York law rather than federal law would not bring about a different result. See notes 57–62 supra and accompanying text. For an extensive compilation of cases where the imitation and copying of articles were held non-actionable, see Handler, Trade Regulation 971 n. 13 (1960).

192. Haeger Potteries, Inc. v. Gilner Potteries, 123 F.Supp. 261 (S.D.Cal.1954);

McGill Mfg. Co. v. Leviton Mfg. Co., 43 F.2d 607 (E.D.N.Y.1930) ; see p. 691 supra.

193. Yale & Towne Mfg. Co. v. Alder, 154 F. 37 (2 Cir. 1907); Enterprise Mfg. Co. v. Landers, Frary & Clark, 131 F. 240 (2 Cir. 1904); Wesson v. Galef, 286 F. 621 (S.D.N.Y.1922); American Chain Co. v. Carr Chain Works, Inc., 141 Misc. 303, 252 N.Y.S. 860 (Sup.Ct.1931) ; see note 161 supra and accompanying text.

194. E. g., American Safety Table Co. v. Schreiber, supra note 167 (deceptive marketing practices) ; see p. 680 supra.

195. See p. 674 supra.

196. Def. Ex. 9.

registration, however, does not carry with it a prima facie presumption of validity,[197] and, therefore, does not require or support a finding that the trademark "Slim-lighter" is valid. As applied to a pocket lighter, this mark is clearly descriptive, since the words obviously purport to describe the qualities or characteristics of plaintiff's slim-lighter model.[198] Words that merely describe the qualities, features, or composition of an article are not entitled to protection unless a secondary meaning has attached to the mark. See Safeway Stores, Inc. v. Safeway Properties, Inc., 307 F.2d 495, 498–499 (2 Cir. 1962). Plaintiff does not dispute the necessity of proving secondary meaning in its mark.[199] However, there is no adequate proof of secondary meaning for the mark "Slim-lighter." Furthermore, defendant has not used the word "slim" in describing its lighter since late 1959 or early 1960.[200] Plaintiff's claim of trademark infringement is without merit.

## VI

Defendant Rogers has counterclaimed, alleging that Zippo has unfairly competed with it because Zippo has: (1) improperly marked its lighter with an expired patent; (2) improperly used a consent decree obtained against another company; and (3) disparaged defendant's business reputation. Rogers seeks a declaratory judgment and an injunction restraining Zippo from interfering with Rogers' advertisement and sale of its lighters.

■■■■■ Although Zippo eliminated its vertical coil cam spring in favor of a flat leaf spring in 1938, it nevertheless continued thereafter to carry the Gimera patent on its lighters even though that patent covered the discontinued vertical coil spring and did not cover the new leaf spring.[201] In pressing its claim based upon improper marking, defendant relies, inter alia, on 35 U.S.C. § 292, which imposes a fine for improperly marking an article as patented with the purpose of deceiving the public. Such a purpose is a prerequisite to violation of the statute. Victoria-Vogue, Inc. v. Valcort, Inc., 148 F.Supp. 160, 171 (S.D. N.Y.1956). There is no evidence in the record to support a purpose to deceive the public, and I find that defendant has not proved unfair competition by plaintiff because of the improper marking.

■■■■ In 1957, Zippo filed suit in the Southern District of New York, which resulted in a consent decree, entered December 30, 1957, enjoining defendant in that suit from selling any lighter which imitated the shape, form, or appearance of Zippo's lighters.[202] In February 1958, Zippo issued trade releases publicizing the consent decree which became the subject of articles in trade papers.[203] The consent decree in question contains a provision which states:

> "4. * * * [T]his decree cannot be cited as to validity or infringement or other than as between the parties hereto, and further this decree cannot be used for advertising paid for by Plaintiff." [204]

Defendant contends that reference to the consent decree in Zippo's news releases intimidated customers and violated the decree.[205] Plaintiff argues that its news releases were not paid advertisements and that it did not violate the consent decree. While the news releases may have constituted an exaggerated description of the effects of the consent decree itself, I do not feel that plaintiff, by the use of these trade releases, was guilty of unfair competition.

197. 15 U.S.C. §§ 1094, 1057(b).

198. See Pl.Ex. 14.

199. Tr. p. 809.

200. See text accompanying note 37 supra.

201. Tr. pp. 143–45; see note 8 supra and accompanying text.

202. Def.Ex. 51.

203. Def.Exs. 49, 50; Tr. pp. 213–17.

204. Consent Decree, Zippo Mfg. Co. v. Digby Unipax Corp., Civ. No. 126–372, S.D.N.Y., December 30, 1957; Def.Ex. 51, p. 2.

205. Defendant's Main Brief, pp. 131–33.

Finally, defendant claims that a passage from a single letter written by plaintiff's executive vice-president to a customer of both plaintiff and defendant [206] constituted a disparagement of defendant's business reputation. I have examined the letter; the damage, if any, to defendant would be *de minimus*.[207] On this issue, defendant is not entitled to relief.

For the reasons set forth above, I find that defendant is not entitled to relief on its counterclaim.

Accordingly, based upon all the evidence in the case, my judgment as to credibility of witnesses when appropriate, and my findings of fact already referred to, and in the exercise of my discretion, I conclude that (1) with regard to Rogers' marketing of a lighter similar to plaintiff's slim-lighter, plaintiff is not entitled to an injunction or other relief; (2) with regard to Rogers' marketing of a lighter similar to plaintiff's standard lighter, plaintiff is entitled to a decree (a) requiring Rogers to alter its display cards so that the name "Rogers" appears more prominently thereon and, if plaintiff desires, so that the cards indicate that the lighter sold is not a Zippo but a Rogers, (b) giving plaintiff the right, if the parties cannot agree upon the exact manner of such alteration of the display cards, to apply to this Court within thirty days to determine this question, and (c) giving plaintiff the further right, if the parties cannot agree upon the matter, to apply to this Court within thirty days to require Rogers to take further reasonable steps to prevent retailers from selling its lighters in a Zippo box or without using a Rogers display card; (3) plaintiff is not entitled to any accounting or damages; (4) plaintiff's trademark action is dismissed; and (5) defendant's counter-claim is dismissed. The foregoing shall constitute the Court's findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a), 28 U.S.C. A decree, in accordance with these findings and conclusions, shall be settled on notice.

206. Pl.Ex. 38; Tr. pp. 415–16.

207. The letter was an apparent attempt by plaintiff to inquire of one of its retailers regarding an instance of confusion of Zippo and Rogers lighters. If anyone was injured by this letter, it may have been plaintiff, since the retailer apparently became annoyed with Zippo because of the inquiry, and announced his intention to discontinue the Zippo line. Pl.Ex. 38.