OLIVIA BRADLEY, d/b/a Consumer Research Consortium, Plaintiff and Counterdefendant-Appellant, *v.* BOOZ, ALLEN & HAMILTON, INC., NATIONAL ANALYSIS DIVISION, Defendant and Counterplaintiff-Appellee.

First District (2nd Division)    No. 77-1897

◼

Opinion filed December 5, 1978.

Merrill B. Meyer, of Chicago (Rappaport and Meyer, of counsel), for appellant.

---

[1] Justice Brown participated in this decision while assigned to the Illinois Appellate Court, First District.

Garrett L. Boehm, of Chicago (Boehm & Boehm, of counsel), for appellee.

Mr. PRESIDING JUSTICE STAMOS delivered the opinion of the court:

This appeal arises from two orders entered by the circuit court of Cook County. The first of these orders, entered pursuant to the trial of a breach of contract action, found in favor of defendant Booz, Allen & Hamilton, Inc., National Analysis Division (hereinafter referred to as National) and against plaintiff Olivia Bradley, d/b/a Consumer Research Consortium (hereinafter referred to as Bradley), upon plaintiff's complaint and, further, found in favor of defendant upon defendant's counterclaim. The second order denied plaintiff's dual motion for vacation of judgment and for new trial.

In September of 1975 National and Bradley entered into an oral agreement pursuant to which Bradley agreed to perform interviewing functions for a consumer beer survey organized and conducted by National. Bradley received her instructions and materials from National through Dr. Robert Michaels, a study director employed by National. Bradley commenced and completed a pretest and then commenced the interviewing portion of the consumer beer survey. Bradley collected interview forms and periodically transmitted these forms to National. Bradley billed National according to the periodic completion of interviews.

Subsequently, Dr. Michaels determined that Bradley had not conducted interviews in accordance with National's instructions and notified Bradley of his findings. Bradley eventually refused to correct the errors found in the interviews and National refrained from further compensating Bradley (Bradley had received $2,856.87 in prior payment).

National's failure to further compensate Bradley prompted Bradley to commence an action, sounding in contract, in the circuit court of Cook County. The complaint, filed March 3, 1976, alleged that Bradley performed interviews, pursuant to an agreement with National, and thereafter National failed and refused to pay Bradley a balance of $2,583.01. Bradley, through this complaint, sought $2,583.01 in damages, plus court costs.

On April 7, 1976, National responded by filing an answer and counterclaim sounding in contract. The answer admitted that National requested Bradley to conduct interviews and prayed that Bradley's complaint be dismissed with prejudice and that Bradley be taxed with costs.

The counterclaim alleged that Bradley conducted her survey in wilful and wanton disregard of the survey interviewing instructions. It further alleged that National notified Bradley of this and notified Bradley

that the surveys were unacceptable; that Bradley refused to correct the errors; that National was compelled to hire another firm to complete the survey, and that National, in completing the survey, was required to spend an additional $9,908.82. National sought this amount as damages.

On June 14, 1976, Bradley filed an answer to the counterclaim in which all of National's allegations were denied and Bradley prayed that the counterclaim be dismissed. The counterclaim also sought attorney's fees for false allegations and claims.

A trial, to be discussed in detail, ensued (an agreed statement of facts in lieu of a transcript of proceedings is contained in the record on appeal). On April 29, 1977, after the court heard testimony of various witnesses, the circuit court found for National upon both the original complaint and counterclaim. Accordingly, a judgment was entered in favor of National in the amount of $4,037 plus costs.

The culmination of the trial did not terminate the procedural history of the case at bar. On May 27, 1977, Bradley filed a motion to vacate finding for the defendant on the complaint and judgment on counterclaim against the plaintiff, counterdefendant and for judgment on the complaint and dismissal of counterclaim or, in the alternative, for a new trial. On June 20, 1977, National responded with a memorandum in opposition to plaintiff's and counterdefendant's motion to vacate finding for defendant on the complaint and judgment on counterclaim against the plaintiff. On July 6, 1977, Bradley filed a reply to the memorandum of the defendant-counterplaintiff.

On August 19, 1977, the circuit court of Cook County entered its second and last order in this matter. This order denied Bradley's motion for vacation of judgment and for new trial. It is from this order and the aforementioned April 29, 1977, order that Bradley appeals.

At trial, the court heard the testimony of various witnesses. Mrs. Bradley testified on her own behalf. Samuel Hagler, Dr. Robert Michaels, Myrtle Griffin and Robert Joffe testified on behalf of National.

Mrs. Bradley testified that she was the proprietor of Consumer Research Consortium. She stated that in September of 1975, Dr. Michaels of National telephoned her and asked if she would be interested in conducting interviews for a beer survey to be performed by National. Dr. Michaels indicated that 400 satisfactory interviews were needed. These survey interviews would involve adults who drank at least six cans of beer each week. On September 24, 1975, Mrs. Bradley agreed to work for National for a fee of $4,600 plus or minus 10% of this amount.

Mrs. Bradley also agreed to perform a pretest survey consisting of six interviews. Each interview was to be conducted over a 1½-hour period. Mrs. Bradley received pretest interviewing forms and instructions from National. She and another interviewer conducted the pretest.

Mrs. Bradley further stated that on October 13, 1975, she received survey instructions, contact report forms and interview questionnaires from Dr. Michaels. On that date Dr. Michaels informed Mrs. Bradley that National would analyze the interviews as received from Mrs. Bradley. On October 15, 1975, she notified Dr. Michaels that she had commenced the survey interviews.

By October 23, 1975, Mrs. Bradley had submitted 55 interview forms to National. She then received a call from National and she was informed that her contact report forms were improperly completed. On October 28, 1975, she delivered 59 interview forms to National. Sixty-nine more interview forms were delivered to National on October 31, 1975. Again Mrs. Bradley was informed by National that some contact report forms and screening forms were not properly completed. Mrs. Bradley testified that at this time she informed National that she would have her interviewers comply with National's instructions.

On November 4, 1975, 71 interview forms were delivered to National. Again National informed Mrs. Bradley of noncompliance with National's instructions. On November 11, 1975, Mrs. Bradley delivered 146 interview forms to National. She testified that on that day Dr. Michaels told her that he would hold further payment to her because of problems that arose in attempting to validate the interviews. Mrs. Bradley stated that she informed Dr. Michaels that she would do a physical validation for him. If the interviews could not be validated, she indicated that she would again conduct the interviews so that National would be satisfied with her work.

Mrs. Bradley testified that she did a physical validation of 40 interviews conducted by one of her interviewers and then mailed her results to Dr. Michaels for acceptance. This mailing occurred on November 25, 1975.

Bradley also indicated that prior to her mailing of the validation results to National she received from Dr. Michaels 400 blank interview forms. She returned these forms to National. She telephoned Dr. Michaels to inform him that she would no longer work on the consumer beer survey.

On November 25, 1975, a corporate attorney for Booz, Allen & Hamilton told Bradley that if she did not complete the survey she would be in violation of the agreement entered into between Bradley and National. She responded that she would not again conduct the interviews. On November 26, 1975, Bradley received the following telegram from the attorney at Booz, Allen & Hamilton:

"Based upon your statement to R J Michaels on November 25 and K J Wees on November 26 that you refused to complete interviewing as contracted with National Analyst we hereby advise

you that you have breached the contract and that National Analyst will proceed to have the work finished at your expense. You will be held liable for all expenses and damages incurred by National Analyst."

This telegram was admitted into evidence.

Mrs. Bradley completed her testimony by referring to the amount of compensation she had received from National. She had been paid a total of $2,856.87. She stated that National withheld compensation in the amount of $2,583.01.

Samuel Hagler first testified on behalf of National. Hagler is vice president of operations of National. He stated that he had experience in organizing and conducting public opinion surveys and that he was the officer working with National's client in the development and management of the consumer beer survey.

Hagler indicated that the survey had to be complete and accurate. He stated that National's client needed the results to determine whether to spend millions of dollars in the introduction of a new product in the Chicago area. Consequently, a detailed survey was developed. He stated that strict compliance with the instructions was a necessity.

Hagler testified that National utilized the industry standard in validating or verifying survey results. The standard was a validation or verification of 10 percent of the completed interviews. If this sample indicated excessive verification failures, the industry practice was to validate up to 100 percent of the interviews, if necessary.

Hagler stated that he told Dr. Michaels to deduct $615 from Mrs. Bradley's invoices due to the extra expense caused by her. He testified that he was the ultimate decision making authority regarding the consumer beer survey.

Dr. Robert Michaels, a study director employed by National, next testified. He stated that he was in charge of the day to day operation of the survey. Michaels hired persons to conduct the interviews. He told Bradley that he needed 400 satisfactory interviews from the Chicago metropolitan area. He instructed Bradley to spend 45 minutes per interview. He sent her the instructions pursuant to which the survey was to be conducted and contact report forms, screening forms and interviewing forms.

Michaels stated that on October 23, 1975, National advised Bradley that her interviewers were incorrectly completing the contact report forms. The interviewers were not listing contacts at which no interview followed. Michaels also stated that Bradley submitted screening questionnaires for those qualified to be interviewed but submitted few of these for people who did not qualify.

On November 7, 1975, Michaels told Bradley that a large percentage of her interviews could not be validated by the company hired by National to perform the validation survey. Bradley, he stated, offered to physically validate the interviews which were incapable of validation due to the absence of or incorrect listing of telephone numbers.

Michaels testified that early in October of 1975, National hired Marcor Marketing Services, Inc. (hereinafter referred to as Marcor), to conduct a standard 10-percent validation of all interviews submitted to National. Marcor informed Michaels that a substantial percentage of Bradley's sampling could not be verified. By November 17, 1975, Marcor was authorized by Dr. Michaels to validate all of Bradley's work.

Michaels stated that on November 11, 1975, he informed Bradley that National would withhold payment on her last invoice until all problems were rectified. On November 20, 1975, Michaels informed Bradley that an excessive percentage of the interviews submitted could not be verified. He testified that he then told Bradley that she would be sent 340 blank interview forms and instructions regarding the work which was to be done. He also told Bradley that $615 would be subtracted from the agreed contract compensation due to the costs of printing the materials. Michaels stated that during this conversation Bradley did not refuse to reconduct the interviews.

Michaels testified that on November 24, 1975, he was informed by National office personnel that Bradley returned the replacement interview forms. During a subsequent telephone conversation Mrs. Bradley stated to Michaels that she would no longer work on the survey. Michaels then turned the matter over to the legal department of Booz, Allen & Hamilton Inc.

Dr. Michaels concluded his testimony by referring to Marcor and Myrtle Griffin. He stated that National retained Marcor to conduct validation interviews. This validation survey was to determine (1) whether the original survey was taken, (2) how long it took, (3) if the respondent filled out a form, and (4) how much beer that respondent drank per week. Marcor subsequently completed a 100-percent validation survey and transmitted the results to National.

To salvage some of the interviews conducted by Bradley, National retained the services of Myrtle Griffin. She conducted physical validation on all interviews which could not be validated by telephone. Mrs. Griffin found that 45 interview respondents did not exist. She learned that some addresses were erroneous and that some named respondents did not reside at the listed addresses.

Myrtle Griffin then testified on behalf of National. She stated that she had been a survey interviewer or supervisor of survey interviews for

approximately 12 years. She had been hired by National to conduct a physical validation of interviews completed for the consumer beer survey.

Mrs. Griffin testified that a large number of interview respondents did not exist. She stated that some of the addresses at which these respondents purportedly lived did not exist. She learned of this by inquiring of the neighbors of the respondents. If the neighbors stated that they knew no such person, Mrs. Griffin's results indicated "no such person." Twenty-two of these "no such address" validation reports were introduced into evidence.

Robert Joffee, vice president of Marcor Marketing Services, Inc., then testified. He stated that Marcor was a corporation which conducted telephone surveys and validations. Marcor conducted a standard validation of consumer beer survey interviews. The validation, he testified, was conducted in the regular course of Marcor's business.

Joffee indicated that he personally supervised the validation and that a large majority of Bradley's interviews could not be validated. At this point in the trial the validation interviews were offered and admitted into evidence along with the corresponding consumer beer survey interviews.[1]

Dr. Robert Michaels again testified. His testimony on this second occasion referred to damages sustained by National. He stated that National hired Ashanti Research in January of 1976 to perform 175 interviews after Bradley told Michaels that she would not proceed with the interviewing. Ashanti commenced the work but later informed Michaels that it could not continue. National paid Ashanti $715.

National then retained The Answer People to conduct 150 interviews. National accepted and validated 109 of these interviews. National paid The Answer People $1,830 and an additional $81 for physical validation.

National also retained Baxter Research Interviewing to conduct 150 interviews. Of these interviews, National accepted 125 and Baxter was paid $2,628.63. Michaels testified that National also incurred expenses in the amount of $4,037 for the time needed to correct Bradley's errors. Michaels concluded his testimony by stating that National paid Bradley $2,856.87 for less than one-half of the interviews she agreed to perform.

On appeal, Bradley raises the issue of whether the Marcor validation survey was properly admitted into evidence. Appellant contends that the validation survey constitutes inadmissible hearsay.

We note at this point that in analyzing the admissibility of survey research we are potentially presented with a double hearsay problem.

---

[1] At page 7 of appellant's brief it is stated that plaintiff objected to the admission of the validation forms as business records of Marcor. The agreed statement of facts does not reflect this objection.

This problem is best depicted as follows:

Level 1: Interviewee "reports" to interviewer

Level 2: Interviewer enters data in survey

The survey is offered into evidence.

If the survey does, in fact, constitute hearsay, then in order to be admitted into evidence an exception to the hearsay rule must apply at both level one and two.

We have noted that the hearsay problem is "potential." This is due to the fact that Marcor's survey may not have been offered to prove its truth. Hearsay has been defined as:

"[T]estimony in court, or written evidence, of a statement made out of court, the statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter."

McCormick, Handbook of The Law of Evidence §246, at 584 (2d ed. 1972).

Certainly, Marcor's survey would have had value even if it were not offered to prove its truth. The fact that the results of the Marcor survey differed from the results of the Bradley survey would have shed light upon the credibility of the Bradley survey. Assuming that this was the motive underlying the proffer of the Marcor survey into evidence it would be clear that the survey would not have been offered to prove its truth. Therefore, the survey would not constitute hearsay.

Assuming, however, that Marcor's survey was offered to prove its truth we must find some approach to justify its admission into evidence. The circuit court cited three cases in its August 19, 1977, order denying Bradley's motion for vacation of judgment and for new trial, *Holiday Inns, Inc. v. Holiday Out In America* (5th Cir. 1973), 481 F.2d 445; *United States v. Partin* (E.D. La. 1970), 320 F. Supp. 275, *appeal dismissed for lack of jurisdiction* (5th Cir. 1970), 432 F.2d 556; *Zippo Manufacturing Co. v. Rogers Imports, Inc.* (S.D.N.Y. 1963), 216 F. Supp. 670, thus we will first analyze the approach of these cases.

■■ In *Holiday Inns, Inc.* and *Zippo* survey results were found admissible pursuant to the "state of mind" exception to the hearsay rule. It should be noted that the "state of mind" exception to the hearsay rule would apply to the aforementioned Level 1 hearsay—the responses of the interviewees to the interviewer. The "state of mind" exception applies to declarations relating to a condition of mind or emotion existing at the time of the statement and must have been made under circumstances indicating apparent sincerity. (McCormick, Handbook of The Law of Evidence §294 (2d ed. 1972).) Therefore, if the responses of the interviewees reflected present states of mind, these responses could be encompassed by the "state of mind" exception to the hearsay rule.

In *Partin*, a different approach was taken to the problem of the admissibility of a survey. The United States District Court stated:

"It is the opinion of this Court, however, that little would be gained in this case by requiring defendant to parade all thirty-one interviewers to the witness stand in order to overcome the government's hearsay objection. Such unnecessary cumulation would obviously be a waste of judicial time and expense and would contribute absolutely nothing to our decision on the merits of the motion for change of venue. Regardless of who lays the foundation, even a cursory examination of the poll reveals its patently self-serving nature. Thus, * * * , the absence of the interviewers and the lack of opportunity for the government to cross-examine each of them personally under oath will simply be attributed to the weight eventually accorded the results of the poll rather than render it inadmissible altogether as evidence in this case." 320 F. Supp. 275, 281.

This seemingly liberal approach has more recently been adopted by the Supreme Judicial Court of Massachusetts (*Commonwealth v. Trainor* (1978), ___ Mass. ___, 374 N.E.2d 1216.) In *Trainor*, that court stated:

"We are not inclined to pause long to resolve whether a survey of people's opinions is hearsay and, if it is, whether it is admissible under the state of mind exception to the hearsay rule. Numerous authorities have admitted particular surveys under that hearsay exception. [Citations.] The focus should be on the techniques employed rather than on whether hearsay is involved. [Citation.] A properly conducted public opinion survey itself adequately ensures a good measure of trustworthiness, and its admission may be necessary in the sense that no other evidence would be as good as the survey evidence or perhaps even obtainable as a practical matter. [Citations.] * * * In certain instances, any weaknesses in the manner in which a poll was conducted might affect only the weight to be accorded the survey results rather than the admissibility of the survey in evidence." ___ Mass. ___, ___, 374 N.E.2d 1216, 1221.

■■ An Illinois appellate court, in the case of *Morelli v. Board of Education* (1976), 42 Ill. App. 3d 722, 356 N.E.2d 438, considered the admissibility of the results of polls taken of faculty members. The court held that such results were properly admitted under the "state of mind" exception to the hearsay rule. We approve of this approach and find it instructive in the case at bar, insofar as this approach encompasses Level 1 hearsay (statements made to interviewers by interviewees). Thus, we believe that responses of interviewees given to interviewers are admissible under the "state of mind" exception to the hearsay rule.

This holding, however, does not fully resolve the issue of the admissibility of the Marcor survey. In order for that survey to be admissible in evidence a hearsay exception must attach to Level 2 hearsay—the impressions of the interviewer as memorialized in written reports.

We believe that Illinois Supreme Court Rule 236(a) (Ill. Rev. Stat. 1975, ch. 110A, par. 236(a)) encompasses this second level of hearsay and allows for its admission into evidence. Rule 236(a) states:

"(a) Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence, or event, shall be admissible as evidence of the act, transaction, occurrence, or event, if made in the regular course of any business, and if it was the regular course of the business to make such a memorandum or record at the time of such an act, transaction, occurrence, or event or within a reasonable time thereafter. All other circumstances of the making of the writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but shall not affect its admissibility. The term 'business,' as used in this rule, includes business, profession, occupation, and calling of every kind."

The testimony of Robert Joffe, vice president of Marcor Marketing Services, Inc., indicates that the Marcor survey qualified as a "business record." He stated that the validation survey was conducted in the regular course of Marcor's business and that Marcor was a corporation which regularly conducted telephone surveys and validations. Joffe also testified that he personally supervised the validation.

We have analyzed both levels of hearsay involved in "survey evidence." We have found that the "state of mind" exception to the hearsay rule and the "business records" exception as contained in Illinois Supreme Court Rule 236 are applicable. Therefore, we, as did the circuit court, hold that the Marcor survey was properly admitted into evidence. See Wigmore, A Treatise on The Anglo-American System of Evidence §1704, at 27 n.1 (Supp. 1975).

Appellant also argues that she did not breach her contract with National. Appellant submits that when National attempted to force appellant to reconduct 340 interviews National offered appellant the opportunity to enter into a new agreement. Appellant argues that her refusal to proceed with a new contract was proper.

Appellant's position is without merit. National's submission of blank interview forms to appellant evidenced National's hope that appellant could conduct satisfactory interviews which would satisfy appellant's contractual obligations.

The circuit court heard sufficient testimony relative to the inadequacy of the interviews submitted to National by appellant. The court, therefore, had sufficient evidence before it to justify a finding that appellant had breached her agreement with National by failing to give National satisfactory interviews. We do not intend to disturb this finding.

Accordingly, the judgments entered by the circuit court of Cook County are affirmed.

Affirmed.

DOWNING and BROWN[2], JJ., concur.

---

[2] Justice Brown participated in this decision while assigned to the Illinois Appellate Court, First District.